Filed 8/27/12

# IN THE SUPREME COURT OF CALIFORNIA

In re MIGUEL ANGEL BACIGALUPO    )
                                 )            S079656
        on Habeas Corpus.        )
_____ )

On petitioner's automatic appeal in this death penalty case, we affirmed the judgment. Thereafter, petitioner filed a habeas corpus petition. We ordered an evidentiary hearing on petitioner's claim that the prosecution had failed to disclose evidence that would have supported a case in mitigation at the penalty phase that petitioner committed the two murders because of a Colombian drug cartel's death threats against him and his family. After hearing the testimony of 17 witnesses, the referee found merit to petitioner's claim. We uphold that determination by the referee, and we grant petitioner's habeas corpus petition for relief from the judgment of death.

## I. PROCEDURAL BACKGROUND

In April 1987, a jury found petitioner Miguel Angel Bacigalupo guilty of the December 29, 1983, murders of brothers Orestes and Jose Luis Guerrero. (Pen. Code, § 187; further undesignated statutory references are to the Penal Code.) The jury also found to be true special circumstance allegations of multiple murder (§ 190.2, subd. (a)(3)) committed during a robbery (former § 190.2, subd.

1

(a)(17)(i)).[1]  The jury returned a verdict of death.  In June 1987, the trial court sentenced defendant to death.  Four years later, this court affirmed the judgment in its entirety.  (*People v. Bacigalupo* (1991) 1 Cal.4th 103.)

Thereafter, the United States Supreme Court, ruling on petitioner's certiorari petition challenging our decision, vacated our judgment and remanded the matter to our court for reconsideration (*Bacigalupo v. California* (1992) 506 U.S. 802) in light of the then recent decision in *Stringer v. Black* (1992) 503 U.S. 222.  In *Stringer*, the high court set aside a Mississippi death judgment because the jury had considered an unconstitutionally vague aggravating factor in its penalty decision.  (*Id.* at p. 237.)  After the parties' briefing and after oral argument on whether the *Stringer* analysis applied in this case, we again affirmed the judgment. (*People v. Bacigalupo* (1993) 6 Cal.4th 457, 475.)  We concluded that because of differences between the California and the Mississippi death penalty schemes, *Stringer* did not apply to this California case.  (*Ibid.*)  The high court then denied the petition for certiorari.  (*Bacigalupo v. California* (1994) 512 U.S. 1253.)

Petitioner's first habeas corpus petition, filed in May 1993, was denied by us in May 1994, based on the merits as well as untimeliness.  This, his second petition, was filed in June 1999.  In March 2001, we ordered the California State Department of Corrections (which has custody of prisoners sentenced to death) to show cause why petitioner was not entitled to relief from the judgment of death (our order did not pertain to either of the two murder convictions or the special circumstance findings) in light of petitioner's claim that the prosecution before trial failed to disclose evidence that at the penalty phase would have supported

---

[1]     The robbery-murder special circumstance has been renumbered as section 190.2, subd. (a)(17)(A).

petitioner's claim of having killed under duress.  (See § 190.3, factor (g) [allowing evidence regarding "[w]hether or not defendant acted under extreme duress or under the substantial domination of another person"].)  After the parties' briefing of that question, this court in November 2003 ordered an evidentiary hearing before a referee.

Initially, because petitioner's trial occurred in Santa Clara County, we referred the matter to the presiding judge of that county's superior court for selection of a referee.  Petitioner, however, sought to have all of the judges of the Santa Clara County Superior Court disqualified because Judge Joyce Allegro of that court had been the prosecutor in petitioner's capital trial.  We then vacated our initial order and reassigned the matter to the Contra Costa County Superior Court's presiding judge, who proposed as referee retired Judge Richard Arnason.  In March 2004, we appointed Judge Arnason as referee, directing him to supervise discovery, take evidence, and make findings on specified questions.  Particularly relevant here is whether the prosecution failed to disclose information it obtained from a confidential informant (Gale Kesselman) who on September 6, 1985, testified at a pretrial ex parte hearing in this case held on the defense request to disclose the informant's identity.

At the reference proceeding, which began in 2004 and had several hearings over a three-year period, 17 witnesses were called (the proceedings comprise some 3,700 transcript pages).  Based on the evidence presented, the referee in June 2009 issued his report, which is before us.  The referee found that the prosecution knew from its confidential informant, Gale Kesselman, that her former boyfriend, Jose Angarita (a Colombian native, who was a major drug dealer in San Jose, California, and knew the murder victims) had made statements implicating himself in ordering the killings.  The referee further found that more than a year before Kesselman's testimony at the September 1985 pretrial ex parte hearing, she had

3

told the prosecution about a meeting between Angarita and petitioner on the night before the murders. These pieces of information from Kesselman, the referee found, were not turned over to the defense by the prosecution and would have lent support to a penalty phase case in mitigation that petitioner killed the two Guerrero brothers while under Colombian Mafia death threats against him and his family.

The Attorney General filed objections to the referee's findings, and petitioner filed a response to those objections. After reviewing those filings, the referee's report, and the record of the reference hearing, as well as the documentary evidence filed in connection with the habeas corpus petition, and the appellate record in petitioner's capital case, we conclude that the withheld evidence was both favorable and material (*Brady v. Maryland* (1963) 373 U.S. 83, 87) on the issue of penalty, thus entitling petitioner to relief from the judgment of death.

## II. 1987 TRIAL EVIDENCE

We summarize the evidence presented in petitioner's April 1987 capital trial that is of relevance here.

In the afternoon of December 29, 1983, petitioner, who had recently come from New York, began working in a San Jose, California, jewelry store owned by Orestes Guerrero, a Peruvian immigrant. The job had been arranged by petitioner's mother, a Peruvian native who knew Orestes through the Peruvian community in the San Francisco Bay area. Present in the jewelry store on December 29 were owner Orestes Guerrero, his brother Jose Luis Guerrero, a Peruvian immigrant named Carlos Valdiviezo, and petitioner. Later that day, petitioner ordered Valdiviezo at gunpoint to lie down. Instead, Valdiviezo ran and hid in the store's bathroom; he came out only after hearing someone leave the

4

store through the front door.  Valdiviezo then discovered the dead bodies of Orestes and Jose Luis Guerrero; both had been shot.  That evening, police arrested petitioner at the Palo Alto home of his mother and stepfather, just as the stepfather was preparing to take petitioner to the airport.  Found in petitioner's suitcases was jewelry taken from Orestes's store.

Petitioner waived his constitutional rights under *Miranda v. Arizona* (1966) 384 U.S. 436, and agreed to talk to the arresting officers about the murders.  Initially, petitioner denied any involvement in the killings, claiming he had spent the entire day alone at his mother and stepfather's house.  He blamed the crimes on an acquaintance, Karlos Tijiboy, saying that Tijiboy looked "a lot like" petitioner and that Tijiboy was "connected with the Mafia."

Later, however, petitioner admitted killing the two Guerrero brothers, claiming he had been ordered to do so two weeks earlier by the Colombian Mafia under threats to kill petitioner and his family, and that it was Tijiboy who had given him the order.  The tape recording of petitioner's interview with the police was introduced into evidence by the prosecution at the guilt phase of petitioner's capital trial.  Tijiboy, called as a witness for the prosecution, identified petitioner, but denied ordering petitioner to kill the Guerrero brothers.

In closing arguments to the jury at the guilt phase of the trial, the prosecution made this statement:  "Now Mr. Aaron [defense counsel] is going to have to find something to talk about.  What will it be?  Perhaps he will argue that there was a Peruvian [*sic*: Colombian] Mafia that ordered the defendant to rob and kill Jose Luis and Orestes Guerrero.  But there is absolutely no evidence of that."  The prosecutor added:  "The evidence is very clear . . . defendant didn't receive any instructions from anyone about robbing and killing the Guerreros.  Only his greed sent him there."  The prosecution reiterated that point at the close of the penalty phase of the trial, when it told the jury the defense had offered no

5

mitigating evidence that petitioner had "acted under extreme duress or under the substantial domination of another person." (§ 190.3, factor (g).) The prosecutor stressed at the penalty phase: "The defendant acted alone. In spite of the fact that he tried to blame others for his conduct, there is no evidence of that. The only duress was his greed. The only domination was his total indifference to human life."

### III. FACTS LEADING TO THE 2004 POSTTRIAL EVIDENTIARY HEARING

#### A. Pretrial (September 1985) Ex Parte Hearing

In August 1985, while petitioner was still awaiting trial for the two murders, his counsel asked the trial court to order the prosecution to disclose the name and whereabouts of a confidential informant who was known to the prosecution and who, according to the defense, was a material witness on the issue of petitioner's guilt of the killings. Attached to the written request was a "Supplementary Offense Report" prepared on May 4, 1984, by San Jose Police Department Sergeant John Kracht and obtained by the defense through discovery. The report stated that Kracht was at a meeting held on April 18, 1984, at the Santa Clara County District Attorney's Office, where prosecution investigators Sandra Williams and Ron McCurdy "provided a confidential informant for purpose of an interview," which was tape-recorded.

Sergeant Kracht's May 1984 report stated: "The informant, relaying statements Jose Angarita made after the murders, suggested that revenge and not robbery was the motive and that the incident that was revenged happened some years ago." The report also mentioned that in April 1984 Sergeant Kracht had interviewed Attorney Joseph DiLeonardo, who once represented Angarita. The police contacted DiLeonardo, Kracht's report explained, "because of statements attributed to him describing the murders of the Guerrero brothers as a contract

6

killing." At the interview, which was tape-recorded, DiLeonardo denied describing the murders as contract killings. According to DiLeonardo, the mention of contract killings came from Santa Clara Police Department Sergeant Tom Hensley, who was preparing a case against one Ronnie Nance, who was then in the Santa Clara County Jail charged with the attempted armed robbery of a drug trafficker.

In opposing the August 1985 defense motion for disclosure of the confidential informant's identity, the prosecution asserted its evidentiary privilege not to reveal that identity, arguing that here the public interest in nondisclosure outweighed the necessity for disclosure. (Evid. Code, § 1041, subd. (a)(2).) A hearing on that issue (Evid. Code, § 1042, subd. (d)) was then held on September 6, 1985, in the chambers of Santa Clara County Superior Court Judge Read Ambler. At that hearing, at which the defense was not present, the judge heard the testimony of two witnesses: Sandra Williams and the confidential informant (Gale Kesselman). Judge Ambler also listened to the April 1984 tape recording of the police interview of the confidential informant. (The contents of this tape recording are described on pp. 11-12, *post*.)

On September 24, 1985, Judge Ambler denied the defense motion for disclosure of the confidential informant's identity, issuing this order: "The Court has conducted an in camera hearing pursuant to Evidence Code Section 1042(d), the People having claimed the privilege set forth in Evidence Code Section 1041 [protecting the identity of a confidential informant]. Based on the evidence presented, including the tape recording in question, the Court concludes that *the informant is not a material witness on the issue of guilt* and that there is no reasonable possibility that non-disclosure of the identity of the informant might deprive the defendant of a fair trial. The Court further finds that revealing any portion of the tape would tend to disclose the identity of the informant." The order further stated: "The transcript of all

7

proceedings held in camera, and the tape introduced into evidence, are ordered sealed, and only a court may have access to same."[2] Thereafter, the prosecution never disclosed to the defense the identity of the confidential informant.

Petitioner later raised issues pertaining to the confidential informant in his second habeas corpus petition, which is now before us.

## B. Second Petition for Writ of Habeas Corpus

Pertinent here is claim G raised in petitioner's second habeas corpus petition and later presented at the evidentiary hearing we ordered on this issue. Claim G asserts that the prosecution withheld evidence that would have lent support to a case in mitigation at the penalty phase of petitioner's capital trial that petitioner killed the victims because of Colombian Mafia death threats against him and his family. Central to this claim is the testimony presented at the pretrial September 1985 ex parte hearing pertaining to the defense request for disclosure of the identity of the confidential informant.

### 1. Testimony at the September 1985 ex parte hearing

At the September 1985 ex parte pretrial hearing in the chambers of Judge Read Ambler, the prosecution called two witnesses: Sandra Williams, an investigator for the Santa Clara County District Attorney's Office, and Gale Kesselman, the confidential informant, each of whom testified out of the presence of the other witness.

Williams testified that while investigating petitioner's murder case, she learned about confidential informant Kesselman through Ronnie Nance, who was

---

[2]     In November 2003, when this court ordered the posttrial evidentiary hearing, we also sent petitioner's habeas corpus counsel a copy of the transcript of the September 1985 pretrial ex parte hearing. That transcript was later admitted into evidence at the evidentiary hearing.

then in the Santa Clara County Jail awaiting trial on charges of attempted murder and robbery. Nance said that Kesselman told him that her former boyfriend, Jose Angarita (a Colombian native and a major drug dealer in San Jose, California), had information about the two murders with which petitioner had been charged. Williams was able to find both Kesselman and Angarita, and she talked to them separately. Kesselman denied telling Nance that Angarita had any involvement in the killings of the two Guerrero brothers. Kesselman told investigator Williams that Angarita "was moving a lot of cocaine through Colombia into Florida," and ultimately California, and that he knew murder victim Orestes Guerrero who had rented a small space in the back of Angarita's jewelry store in San Jose.

Williams further testified at the September 1985 pretrial hearing that Kesselman had given federal agents information that led to a federal drug prosecution against several defendants charged with narcotics violations. In that federal case, Kesselman was a confidential informant and was "being protected." Williams then explained that before becoming an investigator in the district attorney's office, she had been a "special agent" for the California Department of Justice, where she spent two years in an undercover capacity. She expressed the view that in the capital case against petitioner, the disclosure of Kesselman's identity would endanger Kesselman's life. Williams then left the ex parte hearing in Judge Ambler's chambers, and the prosecution called Kesselman as a witness.

Kesselman testified that former boyfriend, Jose Angarita, had been distraught over the death of his friend, Orestes Guerrero, and that he had speculated that "it really wasn't just a robbery." Angarita told Kesselman that he learned about the details of the murder scene from his jewelry business partner, Dan Burke.

The prosecutor then asked Kesselman whether Angarita ever indicated that he knew petitioner, who was charged with killing the two Guerrero brothers.

9

Kesselman replied, "He didn't say one way or the other." The bodies of the two Guerrero brothers were in different rooms, Kesselman said, "So [Angarita] was wondering how, you know, if [the killer] was just some robber, how did that robber manage to kill both people within such a short amount of time, without, you know, being heard and escaping. So that's why [Angarita] was speculating, well, maybe it could have been—maybe it was a revenge killing. Maybe it was a contract killing . . . . He was only speculating. He was wondering why someone, you know, if only the robber could be that fast or maybe there were two people. That's another speculation he used. Maybe there were two people."

According to Kesselman, Angarita was drawing upon his experience as a mercenary in Colombia and his knowledge of firearms when he speculated that the killer "had to be very fast or fairly well trained" or there must have been "two people." In response to questions by the prosecutor, Kesselman said that Angarita made no mention of having information that the murders were either revenge killings or contract killings. The prosecutor then asked whether Kesselman had formed any opinion "as to the reason for the killings based on [her] conversations with Jose Angarita," to which Kesselman replied, "No." After concluding her testimony, Kesselman left the pretrial ex parte hearing, and prosecution investigator Williams was re-called to testify.

The prosecutor asked Williams whether Kesselman had said that Angarita was the source of the information she had given to Williams. Williams replied: "She doesn't know anyone else in this case." Williams further stated that a reference to Angarita was contained in Sergeant Kracht's May 1984 "Supplemental Offense Report," which had been turned over to the defense.

At the end of the September 1985 pretrial ex parte hearing, Judge Ambler said that before ruling on the defense request for disclosure of the confidential

informant's identity, he wanted to listen to the tape recording of Sergeant Kracht's April 1984 interview of confidential informant Kesselman.

## 2. *Sergeant Kracht's tape-recorded interview of confidential informant Gale Kesselman*

In a tape-recorded interview with Sergeant Kracht in April 1984 (three years before petitioner's capital trial), Kesselman described what former boyfriend Angarita had told her about the killings of the two Guerrero brothers. According to Kesselman, Angarita had been "real excited" when he told her that two of his friends had been killed. He said: "They say it was a robbery. But I know it wasn't." When Kesselman asked the reason for the killings, Angarita replied that it was "an organized murder" because of "something that happened years ago." He added that "one of the people was not supposed to die," wondering aloud why the "other guy" had to be there. Angarita had described the murders as "professional" based on the positions of the bodies, each in a different room. He said that the guy who "was picked up" in connection with the murders was "gonna take the . . . fall," and that there was someone else involved, who was "already on [his] way back to New York."

In the tape-recorded interview, Sergeant Kracht asked Kesselman whether she knew of anything else that might suggest that Angarita "was involved or not" in the killings. Kesselman replied: "[W]hile I was talking to [prosecution investigator] Sandy [Williams] and seeing the picture of the guy that, that was arrested for the murders, I think it's the same man that I had driven Jose [Angarita] to [meet] in San Francisco."

Kesselman then described driving with Angarita to a hotel on Nob Hill in San Francisco to meet a man who, Angarita said was from New York and was a "big" Colombian "drug dealer." At one point, Angarita told Kesselman to telephone the hotel for directions. Following the desk clerk's directions, they

arrived at a hotel that Kesselman thought might have been a Hyatt Regency hotel. Standing by the hotel's door was a man Kesselman described as being in his mid-to-late 30's, or possibly younger. The man got into the car, and Kesselman drove around while Angarita and the man had a brief conversation in Spanish, a language that Kesselman did not understand. Kesselman was "almost positive" that Angarita called the man "Miguel" (petitioner's name is Miguel).

### 3. Additional evidence presented in support of the second habeas corpus petition

Claim G in petitioner's second habeas corpus petition asserts that the prosecution, before petitioner's capital trial, had failed to disclose evidence that would have supported a case in mitigation at the penalty phase of petitioner's capital trial that he had killed the two Guerrero brothers while acting under duress — that is, under Colombian Mafia death threats against him and his family. In support of this claim, petitioner presented two declarations by Gale Kesselman, both dated August 7, 1997.

Kesselman's first declaration said that she had testified in chambers in petitioner's capital case, and that she also testified in a federal drug prosecution. After the federal case ended in convictions, she declined an offer by the federal Drug Enforcement Agency to place her in its witness protection program, as she perceived no threat to her personal safety.

Kesselman's second declaration described extensive cocaine smuggling and dealing activities of former boyfriend, Jose Angarita. The declaration then states:

"One day, around late December 1983, Jose asked me . . . to drive with him to San Francisco to meet someone from New York who was going to work for him. I remember we were to meet this man around a hotel and we had some trouble finding the right hotel. When we arrived at the hotel, we picked up Miguel Bacigalupo [petitioner]. Miguel was very casually dressed and he looked nervous

12

and out of place. Jose got in the back seat of the car with Miguel . . . . Jose and Miguel conversed in Spanish, which I do not understand fully. Jose was obviously discussing some kind of business arrangement with Miguel. The next day or so, I heard that two Peruvians[,] Orestes and Jose Guerrero, were killed in their jewelry shop on The Alameda, in San Jose. From that day on, Jose [Angarita] started acting very strangely. He was very nervous, and literally sweating when he watched the reports of the murders on television."

Kesselman's second declaration added that the two murdered Guerrero brothers had previously worked in Angarita's jewelry shop, and that Angarita told her he had "an obligation to set them up in a store," which he considered "a burden." The declaration attributes to Angarita a statement suggesting that "if people crossed him that their whole family would be killed." The declaration also stated that Kesselman herself "began to suspect that Jose [Angarita] had been ordered to kill the Guerrero brothers."

Kesselman's second declaration also described a meeting with prosecution investigator Sandra Williams, who questioned Kesselman about Angarita's possible involvement in the killings of the two Guerrero brothers. Kesselman told Williams about Angarita's drug-dealing activities, and Williams turned that information over to the federal Drug Enforcement Agency. Kesselman estimated that when she was dating Angarita in 1983, he "was probably making one million dollars a week" dealing drugs.

Kesselman's second declaration further stated that she told prosecution investigator Williams "everything" set forth in the declaration. According to Kesselman, Williams told her before the September 1985 pretrial ex parte hearing "not to mention [at that hearing] the possibility that the Guerrero brothers' murders were contract hits ordered by Jose [Angarita]."

13

*4. Evidence in support of the Attorney General's return to our
March 2001 order to show cause*

After we issued an order to show cause (returnable before this court) directing the prosecution to show why petitioner should not be entitled to relief from the death judgment, the Attorney General filed a return. With the return was a declaration by prosecution investigator Sandra Williams, who denied that she ever told confidential informant Kesselman to withhold information or to testify falsely at the September 1985 pretrial ex parte hearing.

The Attorney General also submitted transcripts of two habeas corpus-related interviews of Kesselman conducted in May 2001 by John Kracht, who at the time of petitioner's 1987 trial was a sergeant with the San Jose Police Department, but who in May 2001 was an investigator for the California Department of Justice. In those two interviews, Kracht showed Kesselman a copy of the second of the two declarations she had signed on August 7, 1997, in support of the second habeas corpus petition (at issue here). As noted Kesselman said in that declaration that prosecution investigator Williams had told her not to mention at the September 1985 pretrial ex parte hearing "the possibility that the Guerrero brothers' murders were contract hits ordered by Jose [Angarita]." When Kracht asked Kesselman to point out any inaccuracy in that declaration, she replied that Williams had not told her to withhold information at the ex parte hearing. Kracht also showed Kesselman a photographic lineup, which included a photograph of petitioner taken in 1984 (shortly after the murders of the Guerrero brothers) and photographs of five other Latino men in the same age range. Kracht then asked Kesselman if she could identify the man she and Angarita had met on December 28, 1983 (the night before the murders), at the San Francisco hotel. After initially saying she was unsure, Kesselman ultimately picked out a photograph other than petitioner's.

14

## 5. *Kesselman's third declaration*

In support of the traverse that petitioner submitted in response to the Attorney General's return, petitioner included a third declaration by Kesselman that was signed on May 25, 2002, a year after the just-described tape-recorded interviews with Attorney General investigator Kracht. In that third declaration, Kesselman stated that "everything" mentioned in her two previous declarations signed on August 7, 1997 (in support of the habeas corpus petition) was "accurate and true."

## IV. ORDER OF REFERENCE

### A. Questions for the Referee

In November 2003 we issued an order of reference in connection with petitioner's second habeas corpus petition. The order directed the referee to resolve at an evidentiary hearing several factual issues arising from petitioner's claim G. That claim asserts that the prosecution before petitioner's 1987 capital trial failed to disclose evidence supportive of petitioner's statement to the police that he had killed the two Guerrero brothers because of the Colombian Mafia's death threats against him and his family. Such evidence, according to petitioner, would have enabled him to present a case in mitigation based on duress at the penalty phase of his capital trial. We consider our questions to the referee on pages 21-25, *post*, when we discuss them in connection with the referee's factual findings.

### B. Reference Hearing Testimony

Below, we summarize the testimony relevant to claim G that petitioner presented at the posttrial evidentiary hearing ordered by this court in November 2003.

### 1. *Confidential informant Gale Kesselman*

Petitioner's primary witness in support of the second petition for a writ of habeas corpus was Gale Kesselman, the confidential informant whose identity the

15

defense sought to obtain before petitioner's 1987 capital trial for the murders of the two Guerrero brothers. At the posttrial evidentiary hearing before the referee, Kesselman testified to the series of events leading to her involvement in this case.

In 1983, Kesselman became romantically involved with Jose Angarita, a Colombian native living in San Jose, California. She described Angarita as a San Francisco Bay area cocaine dealer, who sold 20 to 40 kilograms of cocaine each week, netting "around a million dollars or so a week." Angarita, according to Kesselman, operated certain seemingly "legitimate" businesses in the San Jose area, including a gold and silver exchange as well as jewelry stores. Kesselman met Angarita through a mutual friend, who put the two together because Kesselman was in financial trouble. The plan was for Kesselman to work for Angarita in his illegal drug business and to earn enough money to pay off her debts. Kesselman made "drops" of drugs and money for Angarita.

Sometime in 1984, Kesselman became a witness in a federal prosecution against several defendants charged with trafficking in cocaine. (In that case, Angarita was not a defendant; the lead defendant was a "lieutenant" in Angarita's drug trade, and at the reference hearing was, for safety reasons, given the assumed name of simply "Joseph.") Prosecution investigator Sandra Williams had introduced Kesselman to federal Drug Enforcement Agency Agent Rod Alvarez, and Williams told Kesselman to tell Alvarez what she knew about Angarita's drug dealings. Kesselman testified in chambers before a federal judge, describing what she knew about Angarita's drug dealings. By the time of Kesselman's testimony in federal court, Angarita had fled the San Jose area; Kesselman believed him to be dead.

After the defendants in the federal case were convicted, federal agents gave Kesselman $5000 and offered to place her in their witness protection program, an offer she declined.

16

Kesselman mentioned an interview with prosecution investigator Sandra Williams in connection with the murders of the two Guerrero brothers. Kesselman said she told Williams "everything" she knew about Angarita's drug dealings, which according to Kesselman extended from San Francisco to Los Angeles to Miami, and she mentioned Angarita's association with the Medellin drug cartel in Colombia.

Kesselman further testified at the evidentiary hearing that she had told prosecution investigator Williams that on the night before the Guerrero murders, she drove Angarita and his drug trade associate, Joseph (see *ante*, p. 16), to a hotel in San Francisco's Nob Hill area. Angarita said they would be meeting at the hotel a "new supplier" who was from New York City. Angarita planned to talk to the supplier for "just a few minutes." (At the hearing, Kesselman identified petitioner as the person she had met in December 1983 outside the San Francisco hotel.)

Kesselman then mentioned stopping the car in front of the hotel, where petitioner was waiting. Petitioner got into the car, and he and Angarita started talking in Spanish (which Kesselman could not understand), while Kesselman drove the car around the block a few times. After dropping petitioner off at the hotel, Kesselman drove the two male passengers back to San Jose.

Kesselman said that just before testifying at the September 1985 pretrial ex parte hearing she had discussed the issues with prosecution investigator Williams. In that discussion, one thing that "kept coming up" was Angarita's statement to Kesselman that the murders of the two Guerrero brothers were murders "for hire." Angarita had told Kesselman that he had "*instrumented*" [*sic*] the killings of the Guerrero brothers by meeting with petitioner and "directing him to San Jose to the jewelry store" owned by murder victim Orestes Guerrero. Kesselman stated at the

17

reference hearing that she mentioned this information to prosecution investigator Williams before the pretrial ex parte hearing.

Kesselman also testified at the reference hearing that had she been called as a witness at petitioner's 1987 capital trial, she would have testified to the same information she had provided prosecution investigator Williams, namely, Angarita's statements incriminating himself in the murders of the Guerrero brothers as well as the fact that Angarita had met with petitioner the night before the murders.

In cross-examining Kesselman at the reference hearing, the prosecutor asked whether in her tape-recorded interviews with Attorney General investigator John Kracht in May 2001 Kesselman had lied when she told Kracht, contrary to her declaration submitted in support of the habeas corpus petition, that prosecution investigator Sandra Williams had *not* told her to lie at the September 1985 pretrial ex parte hearing. Kesselman then explained at the reference hearing that when Kracht kept wanting to "go over this point again," she just wanted to get it over with, so she told Kracht, "Yes, all that I said" in the previous declarations "was nothing but a lie."

*2. Prosecution investigator Sandra Williams*

Sandra Williams testified at the posttrial evidentiary hearing that in 1984 she was an investigator for the Santa Clara County District Attorney's office. She became the lead investigator in petitioner's capital case on January 9, 1984, some 11 days after the murders of the two Guerrero brothers.

On February 14, 1984, Sergeant Joe Brockman of the San Jose Police Department told Williams that Santa Clara County Jail inmate Ronnie Nance might have some information about the Guerrero murders. On February 17, Williams and Brockman interviewed Nance in the jail. Nance mentioned talking to Gale Kesselman, who indicated to him that someone possibly connected to the

18

murders owned a gold and silver exchange in Sunnyvale, California. According to Williams, she passed on to David Gonzales, an investigator with the Santa Clara County Public Defender's Office, "everything that Nance was saying." On March 6, 1984, Williams interviewed Scott Burke (the son of Dan Burke, Angarita's jewelry business partner), who mentioned Jose Angarita to Williams; this was the first time that Williams had heard that name.

Williams then tracked down Gale Kesselman, who when first interviewed by Williams denied knowing anyone named "Miguel," petitioner's first name. Kesselman insisted that Angarita could not have been involved in killing the two Guerrero brothers because they were his friends. Kesselman initially described Angarita as a "former boyfriend" whom she had "dated" for three months. Later, however, Kesselman said her romantic involvement with Angarita lasted only 30 days. In describing at the reference hearing her conversations with Kesselman, Williams said: "Everything changed with her every time I talked to her."

Williams also testified that she had looked into Kesselman's claim that on December 28, 1983 (the night before the murders) Kesselman and Angarita stopped in front of a hotel on Nob Hill in San Francisco to pick up a man resembling petitioner. Williams contacted hotels in the Nob Hill area and found that for the night of December 28, 1983, none of the guest registers listed any person with a Spanish surname. Nor could Williams verify Kesselman's claim that Angarita was a major drug dealer.

*3. San Jose Police Sergeant John Kracht*

At the reference hearing, John Kracht testified that in April 1984, he was a sergeant in the San Jose Police Department assigned to the capital case against petitioner. While working on the case, Kracht made personal notes. According to Kracht, he would not at the time have given those personal notes to anyone in the district attorney's office. Those personal notes included this entry: "[Prosecution

19

investigators Ron McCurdy and Sandra Williams] indicated that they had tentatively associated [petitioner] with Angarita on the evening before the double murder and had been told by several persons that the homicides were a hit or carried out for financial gain at the direction of another. The other that they suspected was Jose Angarita." Angarita's name, and a suggestion that robbery might not have been the motive for the Guerrero murders, did make it into the "Supplementary Offense Report" that Kracht prepared in May 1984 and that was provided to the defense sometime before August 1985 (when petitioner's counsel attached a copy to the request for disclosure of the confidential informant).

Kracht testified that while working as an investigator for the state Attorney General's Office, he met with Kesselman on May 15 and again on May 17, 2001. He asked her to go over her two 1997 declarations, which supported the habeas corpus petition and were prepared by petitioner's habeas corpus counsel. Kesselman spontaneously pointed out errors in the declarations. Kracht denied pressuring Kesselman to disavow any statements in either of the declarations.

### 4. Attorney John Aaron

Also testifying at the reference hearing was John Aaron, who in 1987 was a deputy public defender in Santa Clara County and represented petitioner at trial; previously, petitioner's counsel had been Deputy Public Defender Michelle Forbes. Aaron stated that before trial he had no evidence to corroborate petitioner's claim to the police that he killed the two Guerrero brothers because of Colombian Mafia death threats against him and his family. Had he known of such evidence, Aaron said, he would have offered it at the trial's penalty phase as mitigating evidence that the killings were committed under duress.

20

### C. Referee's Factual Findings on the Questions in Our Order of Reference

The referee's report, filed in this court in June 2009, comprises some 150 pages, including 39 pages of factual findings in response to the questions we asked in our March 2004 order of reference. Those questions are set forth below, followed by pertinent summaries of the referee's answers.

Our *first* question to the referee asked: "What information did the prosecution obtain before or during petitioner's capital trial regarding a possible connection between one Jose Luis Angarita and the murders of Orestes and Jose Luis Guerrero? What, if any, of this information was given to the defense?"

The referee found that at the time of the capital trial proceedings against petitioner, the prosecution knew from a confidential informant (Gale Kesselman, the former girlfriend of Angarita's) of a statement made by Angarita to Kesselman, that, as phrased by the referee, "the murders were drug-related revenge killings or contract hits on behalf of a drug cartel arising out of a dispute about an old drug debt," and that Angarita acknowledged having been an "instrument in the murders." The referee also found that Kesselman had told the prosecution about a meeting in San Francisco between Jose Angarita and petitioner the night before the murders.

In addition, the referee found that based on the personal notes of San Jose Police Sergeant John Kracht in 1984, three years before petitioner's capital trial, the prosecution had this information:

"[Investigators] Williams and McCurdy gave a presentation [at the district attorney's office] associating Jose Angarita, a former employer of Orestes Guerrero, with cocaine trafficking. They indicated they had tentatively associated Miguel Padilla [petitioner] with Angarita on the evening before the double murder,

21

and had been told by several persons that the homicides were a 'hit,' or carried out for financial gain at the direction of another. The other that they suspected was Jose Angarita."

The above mentioned information, the referee concluded, had not been disclosed to the defense, but the prosecution did provide the defense before trial with a copy of Sergeant Kracht's May 1984 "Supplementary Offense Report." That report mentioned a "confidential informant" who said that "Jose Angarita" had suggested that the "motive" for the Guerrero murders was "revenge and not robbery."

Our *second* inquiry to the referee asked: "Did the confidential informant who testified at the ex parte hearing on September 6, 1985, tell a district attorney investigator or other member of law enforcement connected with this case that the informant had witnessed petitioner's meeting with Angarita and others a day or so before the murders? If so, did the prosecution convey this information to the defense?" Our question further asked: "If the confidential informant told a district attorney investigator or other member of law enforcement about a meeting between petitioner and Angarita, was this information reliable?"

The referee found that the confidential informant (Gale Kesselman) had told prosecution investigator Sandra Williams that Kesselman was present at a meeting between petitioner and Jose Angarita in San Francisco the night before the murders of the two Guerrero brothers, that this information about the meeting was not disclosed to the defense, and that the information was reliable.

Our *third* question asked the referee: "Did the prosecution from any source . . . obtain any information that it did not provide to the defense that would have supported petitioner's claim to the police that he had killed Orestes and Jose Guerrero acting under the Colombian Mafia's death threats to himself or his family?" The referee found that the prosecution knew from Gale Kesselman, the

22

confidential informant, about Angarita's extensive drug dealing activities, his statements incriminating himself in the killings, and his involvement with a Colombian drug cartel, but did not disclose this information to the defense. The referee also found that "the prosecution through Sandra Williams affirmatively told the defense that the information about any putative connection between the killings and a drug-related contract hit was not correct."

Our *fourth* question to the referee asked: "If the prosecution withheld from the defense information (a) about a possible connection between Jose Luis Angarita and the murders of Orestes and Jose Guerrero; or (b) about a meeting between petitioner, Angarita and others a day or so before the killings; or (c) that would have supported petitioner's claim to police that he killed the Guerrero brothers acting under death threats to him and his family, what penalty phase evidence not otherwise known or available to the defense at the time of trial would have come to light had the withheld information been disclosed?"

The referee found that the prosecution had withheld from the defense information about a connection between Jose Angarita and the killings of the two Guerrero brothers and also about a meeting between Angarita and petitioner the night before the killings. Had the prosecution disclosed this information to the defense, the referee said, petitioner's trial counsel could have presented mitigating evidence at the penalty phase of petitioner's capital trial that "there was a bigger fish," namely Jose Angarita, who had manipulated petitioner, a "frightened 21-year-old," to commit the killings, and that Angarita was a major drug dealer with links to a Colombian drug cartel. Disclosure of this information, the referee concluded, would have supported petitioner's claim to the police that he committed the murders under death threats from the Colombian Mafia.

Our *fifth* inquiry to the referee was: "Did a district attorney investigator or other member of law enforcement connected to this case instruct the confidential

23

informant to withhold information at the ex parte hearing held on September 6, 1985? If so, what information, if any, did the confidential informant withhold at that ex parte hearing? Did the district attorney investigator testify truthfully at the September 6, 1985, ex parte hearing?"

The referee found that shortly before the September 1985 pretrial ex parte hearing before Judge Ambler, prosecution investigator Sandra Williams told confidential informant Gale Kesselman "to withhold information . . . and not to testify to all relevant facts" at the September 1985 hearing, and to disavow, in the referee's words, "direct knowledge that [the killings] were contract killing[s]." The referee also found that "Jose Angarita had informed [Kesselman] that the killings were contract and/or revenge killings," and that Kesselman passed this information on to prosecution investigator Williams. The referee concluded that at the 1985 pretrial ex parte hearing Kesselman had "lied" when she testified that Angarita had made no mention to her that the Guerrero murders were "revenge" killings, and that Sandra Williams had "convinced her that . . . all she knew was speculation."

The referee also found that at the September 1985 pretrial ex parte hearing Kesselman did not mention her presence at a meeting between Angarita and petitioner in San Francisco the night before the murders of the two Guerrero brothers. Nor did prosecution investigator Williams say anything on that subject in her testimony at the ex parte hearing even though, as the referee found, Williams knew from Kesselman that Kesselman had been present at a meeting between Angarita and petitioner on the night before the murders. The referee found that at the September 1985 pretrial ex parte hearing Williams "did not testify truthfully" when she said that Kesselman had "no information" about the murders, and when she answered "no" when asked if Kesselman had indicated "in

24

any way that Jose Angarita said he had heard from any source" that the Guerrero murders were revenge killings.

Our *sixth* question asked the referee: "Is it likely that disclosure of the confidential informant's identity to the defense would have led to evidence not otherwise known or available to the defense at the time of trial that would have supported petitioner's claim to have acted under death threats from the Colombian Mafia?" The referee so found. In response to our further question, the referee determined that had the prosecution disclosed the confidential informant's identity to the defense, petitioner's trial counsel would have interviewed her and learned about Jose Angarita's extensive drug dealings, his connection to the Colombian Medellin drug cartel, and his meeting with petitioner in San Francisco the night before the Guerrero murders. This evidence, the referee concluded, would have lent support to petitioner's claim to the police that the Colombian Mafia had ordered him to kill the two Guerrero brothers, and that he had done so because of death threats against him and his family.

Our *seventh* inquiry to the referee was: "At the time of trial, what information was known to the prosecution that would have supported a theory that petitioner was hired to commit the murders or that otherwise could have been used to impeach a penalty phase case in mitigation based on petitioner's having acted under duress?" The referee found that certain information given to the prosecution by confidential informant Gale Kesselman suggested that petitioner had been hired to kill the two Guerrero brothers.

## V. DISCUSSION

### A. Legal Principles

A petition for a writ of habeas corpus is a collateral attack on a presumptively valid judgment. (*In re Bolden* (2009) 46 Cal.4th 216, 224; *In re Clark* (1993) 5 Cal.4th 750, 764.) Therefore, " 'the petitioner bears a heavy

25

burden initially to *plead* sufficient grounds for relief, and then later to *prove* them.' " (*In re Price* (2011) 51 Cal.4th 547, 559.)  When a petitioner states "a prima facie case for relief on one or more claims," and this court issues an order to show cause, that order creates a "new cause" that is "limited to that specific claim or claims." (*People v. Superior Court* (*Pearson*) (2010) 48 Cal.4th 564, 572.)

Once this court issues an order to show cause, the petitioner's custodian "file[s] a responsive pleading, called a return, justifying the confinement." (*People v. Duvall* (1995) 9 Cal.4th 464, 475.)  In response to the return, the habeas corpus petitioner may file a traverse, or "the parties may stipulate that the original habeas corpus petition be treated as a traverse." (*Id.* at p. 477.)  If, after considering the return and the traverse, we determine there are material facts in dispute, we appoint a referee to conduct an evidentiary hearing. (*Id.* at p. 478.)  At that hearing, by a preponderance of the evidence, the petitioner must establish facts that provide a basis for relief. (*In re Crew* (2011) 52 Cal.4th 126, 149; *In re Bolden*, *supra*, 46 Cal.4th at p. 224.)  The main reason for an evidentiary hearing is to have the referee determine the credibility of the testimony given at the hearing. (*In re Thomas* (2006) 37 Cal.4th 1249, 1256.)  Because the referee observes the demeanor of the witnesses as they testify, we generally defer to the referee's factual findings and "give great weight" to them when supported by substantial evidence. (*Ibid.*)

Petitioner's claim here is that before his capital trial for the murder of the two Guerrero brothers, the prosecution failed to disclose to the defense certain information that would have supported a penalty phase case in mitigation that petitioner killed under duress.  Under the federal Constitution's due process clause, as interpreted by the high court in *Brady v. Maryland*, *supra*, 373 U.S. 83, 87 (*Brady*), the prosecution has a duty to disclose to a criminal defendant evidence that is " 'both favorable to the defendant and material on either guilt or

punishment.' " (*People v. Earp* (1999) 20 Cal.4th 826, 866; *In re Sassounian* (1995) 9 Cal.4th 535, 543.) The prosecution's withholding of favorable and material evidence violates due process "irrespective of the good faith or bad faith of the prosecution." (*Brady*, *supra*, at p. 87.)

As the United States Supreme Court has explained, "the term '*Brady* violation' is sometimes used to refer to any breach of the broad obligation to disclose exculpatory evidence — that is, to any suppression of so-called '*Brady* material' — although, strictly speaking, there is never a real '*Brady* violation' unless the nondisclosure was so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict." (*Strickler v. Greene* (1999) 527 U.S. 263, 281, fn. omitted.)

Favorable evidence is material when " 'it could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.' " (*Strickler v. Green*, *supra*, 527 U.S. at p. 290, quoting *Kyles v. Whitley* (1995) 514 U.S. 419, 435.) Put another way, the question is whether, deprived of the information withheld by the prosecution, the defendant received "a trial resulting in a verdict worthy of confidence." (*Kyles v. Whitley*, *supra*, at p. 434.)

In deciding whether evidence not disclosed to the defense was material under these standards, we consider how the nondisclosure affected the defense investigation and trial strategy. (*People v. Zambrano* (2007) 41 Cal.4th 1082, 1132; see *United States v. Bagley* (1985) 473 U.S. 667, 683 ["the reviewing court may consider any adverse effect that the prosecutor's [nondisclosure] might have had on the preparation and presentation of the defendant's case"].) A determination that the prosecution violated its disclosure obligations under *Brady*, *supra*, 373 U.S. 83, requires reversal without any need for additional harmless error analysis. (*Kyles v. Whitley*, *supra*, 514 U.S. at p. 435; *People v. Zambrano*, *supra*, at p. 1133.)

27

## B. Analysis

At issue here is whether the verdict of death resulting from petitioner's penalty phase trial is "worthy of confidence." (*Kyles v. Whitley*, *supra*, 514 U.S. at p. 434.) More specifically, we consider how the penalty verdict may have been affected by the prosecution's failure to disclose to the defense information that it had received from the confidential informant, Gale Kesselman.

In making this assessment, we accept the referee's factual findings, which we conclude are supported by substantial evidence. As relevant here, the referee found that the evidence known to the prosecution but not disclosed to the defense included several incriminating statements made to Kesselman by Jose Angarita, who was her former boyfriend, a Colombian native, and a major drug trafficker in San Jose, California. Kesselman told the prosecution that Angarita told her that he was associated with the Medellin drug cartel operating out of Colombia, that he himself had arranged the December 1983 killings of the two Guerrero brothers, and that the murders were contract killings. Kesselman also told the prosecution that she saw Angarita meet petitioner in San Francisco on the night before the killings.

As the referee found, had the prosecution disclosed Kesselman's identity to the defense, together with the just-described information she had given the prosecution, petitioner's trial counsel could have called Kesselman as a witness at the penalty phase of petitioner's capital trial to testify in support of petitioner's claim to the police that, in killing the Guerrero brothers, he had acted under duress. (See § 190.3, factor (g) [at the penalty phase of a capital trial, the trier of fact must consider, among other things, "[w]hether or not [the] defendant acted under extreme duress or under the substantial domination of another person."].) Her testimony, given as a defense witness at the penalty phase of petitioner's

28

capital trial, would have enhanced petitioner's claim that he had been ordered to commit the murders, and by reasonable inference would have supported his further claim that this order was accompanied by a threat that he and his entire family would be killed if he did not comply. Without this evidence, the jury likely disregarded as self-serving and implausible petitioner's claims to police that the Colombian Mafia had ordered him to kill the Guerrero brothers, and that his entire family would have been killed had he disobeyed that order.

Support for that conclusion is found in the prosecutor's arguments to the jury at both the guilt and penalty phases of petitioner's capital trial. At the *guilt* phase, the prosecutor ridiculed petitioner's claim of having acted under Colombian Mafia death threats. At the *penalty* phase, the prosecutor argued that there was "no evidence" of duress whatsoever, and that the evidence instead showed that petitioner had acted alone and that greed was his sole motive for killing the two Guerrero brothers. The prosecutor could not have made those arguments to the jury if Kesselman had testified, as part of petitioner's penalty phase case in mitigation, that a major drug trafficker associated with the Colombian Medellin drug cartel had admitted to her that he had arranged the Guerrero killings by directing petitioner to murder victim Orestes Guerrero's jewelry store. Such testimony would have cast the penalty phase case presented to the jury in a completely " 'different light.' " (*Strickler v. Green*, *supra*, 527 U.S. at p. 290.) Therefore, we cannot be confident that had such testimony been presented to the jury, it would have returned a penalty verdict of death. (See *Kyles v. Whitley*, *supra*, 514 U.S. at p. 435.)[3]

---

[3]    Some 20 years after petitioner's capital trial, one of the witnesses testifying on his behalf at the evidentiary hearing was a man whom confidential informant Kesselman described at the hearing as a "lieutenant" in Angarita's drug trade. For

(*footnote continued on next page*)

The referee found that prosecution investigator Sandra Williams told the confidential informant (Gale Kesselman) to withhold evidence at the September 1985 pretrial ex parte hearing. This conduct, although quite troubling, is not determinative here. As the high court observed in *Brady*, *supra*, 373 U.S. 83, 87, good faith or bad faith on the prosecution's part plays no role in deciding a due process claim that the prosecution has failed to disclose favorable and material evidence to the defense.

At oral argument in this matter, the Attorney General argued that any obligation the prosecution may have had to disclose to the defense either Gale Kesselman's identity or the information she had provided was excused by a pretrial ruling that she was not a material witness. We disagree. The ruling in question was made by Judge Ambler at the conclusion of an ex parte hearing held

---

(*footnote continued from previous page*)

safety reasons, the man testified at the hearing under the assumed name of simply "Joseph." (See *ante*, p. 16.) According to Joseph, shortly before the murders of the two Guerrero brothers, petitioner told him that petitioner "had to do a job" for Angarita (presumably to commit the murders), and that failure to do so would lead to the killings of petitioner's entire family, beginning with his mother. Joseph attributed to the Colombian Mafia drug cartel the practice of killing the family members of those who defied certain orders. It was not disputed at the reference hearing that the prosecution at petitioner's capital trial did not know of this particular information by Joseph and thus could not have disclosed that information to the defense. With regard to Joseph, the referee found that if, at some point before trial, the prosecution had disclosed to the defense the identity of the confidential informant (Kesselman), the defense could have garnered from the informant the identity of Joseph, his connection to Angarita's drug dealings, and his then service in federal prison. That information would have enabled the defense to contact Joseph.

before him in September 1985, and it was limited to whether Kesselman was a material witness on the issue of petitioner's *guilt* of the Guerrero brothers' murders.  Judge Ambler never addressed whether Kesselman was a material witness on the issue of *penalty* for those murders.  As we have stated, the prosecution's disclosure obligations extend to evidence that is material on either guilt or penalty.  (See *People v. Earp*, *supra*, 20 Cal.4th at p. 866; *In re Sassounian*, *supra*, 9 Cal.4th at p. 543.)

Petitioner has established through evidence that he presented at the reference hearing and that the referee found to be credible that the prosecution violated its disclosure obligations under *Brady*, *supra*, 373 U.S. 83, when it withheld from the defense the above discussed information it had obtained from Gale Kesselman.  As the referee found, that information would have supported petitioner's claim to have acted under Colombian Mafia death threats in his killing of the Guerrero brothers.  Because substantial evidence supports the referee's determination, and it is reasonably probable that petitioner's penalty phase jury would have returned a verdict of life imprisonment without parole had it heard the evidence withheld by the prosecution, we grant petitioner's requested relief from the judgment of death.

## DISPOSITION

The petition for writ of habeas corpus is granted insofar as it seeks relief from the judgment of death.  The judgment of the Santa Clara County Superior Court in *People v. Miguel Angel Bacigalupo*, No. 93351, is vacated to the extent

31

that it imposes a sentence of death.  The petition's remaining claims that challenge petitioner's murder convictions or the special circumstance findings will be resolved by later order to be filed separately.

Upon finality of our opinion, the Clerk of the Supreme Court is to remit a certified copy of the opinion and the order to the Santa Clara County Superior Court for filing, and respondent Attorney General is to serve a copy of the opinion on the prosecuting attorney.  (See Pen. Code, § 1382, subd. (a)(2); see also *In re Sixto* (1989) 48 Cal.3d 1246, 1265-1266; *In re Hall* (1981) 30 Cal.3d 408, 435, fn. 9.)

KENNARD, J.

WE CONCUR:

CANTIL-SAKAUYE, C. J.
BAXTER, J.
WERDEGAR, J.
CHIN, J.
CORRIGAN, J.
LIU, J.

**CONCURRING OPINION BY LIU, J.**


I join the court's opinion. The prosecution's withholding of favorable, material evidence that would have been provided by a confidential informant, Gale Kesselman, violated petitioner's right to due process under *Brady v. Maryland* (1963) 373 U.S. 83, 87 and entitles him to relief. I write separately to highlight three additional points in favor of the court's holding.

The first concerns the significance of Judge Ambler's pretrial ruling that Kesselman was not a material witness. The court rejects the Attorney General's argument that "any obligation the prosecution may have had to disclose to the defense either Gale Kesselman's identity or the information she had provided was excused" by that ruling. (Maj. opn., *ante*, at p. 29.) As the court explains, Judge Ambler's pretrial ruling "was limited to whether Kesselman was a material witness on the issue of petitioner's *guilt* of the Guerrero brothers' murders. Judge Ambler never addressed whether Kesselman was a material witness on the issue of *penalty* for those murders. As we have stated, the prosecution's disclosure obligations extend to evidence that is material on either guilt or penalty." (*Ibid.*)

Equally significant, in my view, is the referee's finding that prosecution investigator Sandra Williams lied and induced Gale Kesselman to lie at the September 1985 ex parte hearing that led to Judge Ambler's pretrial ruling. After hearing Kesselman and Williams testify at the reference hearing, the referee found that Kesselman was a credible witness and that Williams was not. The referee

1

further found that Williams told Kesselman "to withhold information . . . and not to testify to all relevant facts" at the September 1985 hearing. Specifically, the referee found that Kesselman "lied" when she denied at the hearing that Angarita had given her "any information that he knew [the murders were] contract killing[s]" and that Kesselman did so because "Williams had convinced her that . . . all she knew was speculation" despite the fact that "Angarita had told [Kesselman] in so many words that this was a contract killing." The referee further found that at the September 1985 hearing, "Williams did not testify truthfully when she testified . . . that [Kesselman] had no information about the murder case" and when Williams answered "no" to the question whether Kesselman "indicate[d] in any way that Jose Angarita said that he had heard from any source" that the murders were revenge killings. Therefore, Judge Ambler's determination that Kesselman was not a material witness was, according to the referee's findings, unmistakably tainted by the prosecution's misconduct. That misconduct concealed the very information that would have led Judge Ambler to conclude that Kesselman was a material witness at least for the penalty phase of the trial.

The second point concerns the referee's finding, noted by the court, that had the defense gained access to Kesselman, it "would have" uncovered another key witness, someone who had worked in Angarita's operation and who testified at the reference hearing on condition of anonymity using the name "Joseph." Joseph worked for Angarita around the time of the murders and knew a great deal about Angarita's operation. Kesselman knew Joseph, and she further knew that Joseph was in federal prison for sale of cocaine at the time of petitioner's trial because her cooperation with the Drug Enforcement Agency had helped to put him there. A police report in defense counsel's possession had identified Joseph as an

2

associate of Angarita, but had incorrectly and misleadingly reported that Joseph had "bailed and split" and that his whereabouts were unknown.

The referee found that Joseph was a credible witness. Contrary to the Attorney General's argument, any minor factual discrepancies in his testimony about events that occurred 23 years earlier do not undermine that finding, for we assume the referee considered those discrepancies, along with Jospeh's demeanor, while testifying, before concluding he was a credible witness. (*In re Price* (2011) 51 Cal.4th 547, 559 ["Because the referee observes the demeanor of testifying witnesses, and thus has an advantage in assessing their credibility, this court ordinarily gives great weight to the referee's findings on factual questions."].) From Joseph, the defense would have learned about Angarita's drug operation and his ruthless methods of enforcement. Critically, the defense also would have learned about Angarita's statements to Joseph that the murder victims, the Guerrero brothers, stole two kilos of cocaine from Angarita and that he wanted them killed and intended to have them killed. Joseph also would have corroborated Kesselman's account of a meeting between petitioner and Angarita the night before the murders. Joseph confirmed at the reference hearing that if he had been contacted in prison, he would have been willing to provide this information to petitioner's attorney.

Most significantly, the referee found that Joseph would have provided evidence of a conversation between him and petitioner before the Guerrero brothers were murdered. In that conversation, petitioner recounted that Angarita had ordered petitioner to do a "job" and that if he did not do it, Angarita would kill members of petitioner's family, starting with his mother. According to Joseph, petitioner's eyes were filled with tears as he revealed his predicament, and Joseph told him not to do it. This was the last Joseph saw of petitioner. This testimony would have strongly corroborated petitioner's penalty phase duress defense.

3

The Attorney General is not correct that the rule against hearsay evidence bars us from considering Joseph's testimony. First, Joseph's testimony at the reference hearing was admissible for the non-hearsay purpose of determining what evidence the defense would have uncovered but for the prosecution's misconduct, a determination directly responsive to the sixth question this court put to the referee: "Is it likely that disclosure of the confidential informant's identity to the defense would have led to evidence not otherwise known or available to the defense at the time of trial that would have supported petitioner's claim to have acted under death threats from the Colombian Mafia?" Second, much of Joseph's testimony would have been admissible at the penalty phase of petitioner's trial had Joseph been called as a witness. Joseph's testimony recounted statements by Angarita that were against Angarita's penal interest and hence admissible under Evidence Code section 1230 as statements that "subjected [the declarant] to the risk of civil or criminal liability." In addition, Joseph's testimony of his conversation with petitioner would have been admissible under Evidence Code section 1250 as evidence of petitioner's then-present state of mind — in particular, that petitioner was under duress at the time he committed the murders. (See 6 Wigmore, Evidence (Chadbourn rev. 1976) § 1714, p. 90 ["the judicial doctrine has been that there is a fair necessity, for lack of other better evidence, for resorting to a person's own contemporary statements of his mental or physical condition"].) Further, there is no evidence that petitioner's statements to Joseph were "made under circumstances such as to indicate its lack of trustworthiness." (Evid. Code, § 1252.)

As the Attorney General notes, petitioner would have known about his conversation with Joseph. But defense counsel — unaware of Joseph's whereabouts and unable to otherwise corroborate petitioner's statement to the police that the murder was for hire and committed under duress — reasonably

4

concluded that the duress defense was not worth pursuing. Without corroboration, the duress defense might have done more harm than good; the jury might have viewed it as a deceptive attempt by petitioner to evade responsibility for the murders, as the prosecution argued at trial. (Maj. opn., *ante*, at p. 28.) The referee's finding that defense counsel would have prepared a credible duress defense had they gained access to Kesselman and Joseph is supported by substantial evidence in the record.

Even if the prosecution did not know what testimony Joseph would have given at trial, we may still consider that potential testimony in determining the materiality of the prosecution's failure to disclose evidence supplied by Kesselman. As the United States Supreme Court said in *United States v. Bagley* (1985) 473 U.S. 667, 682, evidence withheld by the prosecution "is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." Importantly, the high court made clear that "the reviewing court may consider directly any adverse effect that the prosecutor's failure to respond might have had on the preparation or presentation of the defendant's case." (*Id.* at p. 683.) We have not previously considered the outer limits of this aspect of *Brady*'s liability, and we need not do so here given the specificity of the referee's findings. Here, the referee found, the prosecution was aware of, and made a conscious attempt to suppress, the fact that Kesselman had substantial information about Jose Angarita and his drug trafficking that corroborated petitioner's claim of a murder for hire. One of the major adverse effects of the prosecution's improper efforts to suppress the Kesselman evidence and to prevent the defense from contacting Kesselman was that the defense failed to uncover the critical evidence corroborating petitioner's duress defense that Joseph's testimony would have provided.

5

Third, the referee found that Williams played an active role in discouraging defense counsel from pursuing a duress defense. Defense investigator Alayne Bolster had conducted a pretrial interview of District Attorney investigator Ron McCurdy in February 1986. During that interview, McCurdy disclosed that Karlos Tijiboy, whom petitioner had identified as the person who ordered him to kill the Guerreros, was involved in Angarita's drug trafficking operation. McCurdy also described Angarita's connections to the victims and to the wife of one of the victims. He told Bolster that Angarita had three or four drug lieutenants in his drug business, including Joseph. McCurdy also told Bolster that Williams might know more.

When Bolster followed up with Williams, Williams told Bolster that the information relayed by McCurdy was incorrect. Williams said that Tijiboy had nothing to do with drugs or with Angarita, and that she could find no connection between Angarita and the drug trade — even though Williams was clearly aware of such a connection, according to the referee's findings. She also told Bolster that there was no drug-related connection between Angarita and the victims or between Angarita and petitioner — even though the referee repeatedly found Williams's testimony that she saw no connection between Angarita and the murders not to be credible.

According to the referee, "the prosecution through Sandra Williams affirmatively told the defense that the information the defense had about any putative connection between the killings and a drug-related contract hit was not correct." As a result, defense counsel believed and relied on Williams's representations that further investigation of a drug connection to the murders would be a dead end. Thus, the prosecution did not simply suppress favorable, material evidence. It also affirmatively dissuaded the defense from pursuing a line

6

of inquiry that would have uncovered such evidence.  (See *United States v. Bagley, supra*, 473 U.S. at p. 682.)

For purposes of assessing materiality, we must consider collectively all undisclosed evidence in order to assess its cumulative effect.  (*In re Brown* (1998) 17 Cal.4th 873, 887.)  Accordingly, for the reasons above, and for the reasons stated in the court's opinion, I agree that petitioner is entitled to relief.

LIU, J.


WE CONCUR:  CANTIL-SAKAUYE, C. J.
              WERDEGAR, J.
              CORRIGAN, J.

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** In re Bacigalupo

_____

**Unpublished Opinion**
**Original Appeal**
**Original Proceeding** XXX
**Review Granted**
**Rehearing Granted**


_____

**Opinion No.** S079656
**Date Filed:** August 27, 2012

_____

**Court:** Superior
**County:** Santa Clara
**Judge:** Thomas Hastings


_____

**Counsel:**

Robert R. Bryan, under appointment by the Supreme Court, Michael G. Millman, Karen S. Schryver, Steven W. Parnes, Robert S. Mahler and Kevin Little for Petitioner Miguel Angel Bacigalupo

Bill Lockyer, Edmund G. Brown, Jr., and Kamala D. Harris, Attorneys General, David P. Druliner, Robert R. Anderson and Dane R. Gillette, Chief Assistant Attorneys General, Ronald A. Bass and Gerald A. Engler, Assistant Attorneys General, Ronald S. Matthias, Stan M. Helfman, Glenn R. Pruden and Jeffrey M. Laurence, Deputy Attorneys General, for Respondent State of California.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Robert R. Bryan
Law Offices of Robert R. Bryan
2107 Van Ness Avenue, Suite 203
San Francisco, CA  94109-2572
(415) 292-2400

Jeffrey M. Laurence
Deputy Attorney General
455 Golden Gate Avenue, Suite 11000
San Francisco, CA  94102-7004
(415) 703-5897