Filed 1/7/14  P. v. Fowler CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E056068 |
| v. | (Super.Ct.No. FWV1002147) |
| RICKY LEE FOWLER, | **OPINION** |
| Defendant and Appellant. | |

APPEAL from the Superior Court of San Bernardino County.  Stephan G. Saleson, Judge.  Affirmed.

Dacia A. Burz, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Senior Assistant Attorney General, James D. Dutton and Sabrina Y. Lane-Erwin, Deputy Attorneys General, for Plaintiff and Respondent.

Defendant Ricky Lee Fowler forcibly sodomized his cellmate at the West Valley Detention Center (WVDC) on three separate occasions in August 2010.

Defendant was convicted of three counts of sodomy by force (Pen. Code, § 286, subd. (c)(2))[1] against John Doe 1. After waiving his right to a trial, defendant admitted that he had suffered two prior serious or violent felony convictions (§§ 667, subds. (b)-(i) & 1170.12, subds. (a)-(d)). Defendant was sentenced to a total state prison sentence of 75 years to life.

Defendant now contends on appeal as follows:

1.     The trial court abused its discretion by denying his motion for new trial based on a *Brady*[2] violation.

2.     The trial court denied his due process right to an evidentiary hearing on his asserted *Brady* violation.

3.     The trial court abused its discretion when it refused to consider evidence in the court records pertaining to the competency proceedings against a prosecution witness.

We affirm the judgment.

---

[1]     All further statutory references are to the Penal Code unless otherwise indicated.

[2]     *Brady v. Maryland* (1963) 373 U.S. 83 (*Brady*).

2

# I

## FACTUAL BACKGROUND

A.  *People's Case-in-Chief*

1.  *Acts against victim – Doe 1*

Doe 1 was serving a 15 year sentence in state prison based on a plea to voluntary manslaughter, assault with a firearm, discharging a firearm and first degree burglary.  He had several other prior convictions.

In June 2010, he was housed in the WVDC.  Defendant was his only cellmate. Doe 1 occupied the top bunk and defendant was on the bottom bunk.  There was also a desk in the cell.

Initially, when they were first cellmates, defendant and Doe 1 got along well. They played cards together.  However, defendant became stressed when the trial for which he was detained started, which caused tension in their cell.  Defendant started punching and biting Doe 1.  Defendant tried to kiss Doe 1.  He tried to push his tongue in Doe 1's mouth but Doe 1 clenched his teeth so his tongue could not get in his mouth. Defendant slapped Doe 1's buttocks and touched his penis over his clothes.

On Doe 1's birthday, on August 3, they had some Pruno wine they had made.  Doe 1 and defendant got drunk.  They got into a physical fight.  Defendant put Doe 1 in a chokehold and choked Doe 1 so hard he thought he was going to die.  Defendant kept telling him "don't fuck with Rick" and that "Rick will whoop your ass."  Doe 1 was able to get away.  Doe 1 asked one of the sheriff deputies to get him out of the cell because he thought defendant was going to kill him, but his request was disregarded.

3

After that day, defendant called Doe 1 his "little buddy," and told him he loved him. Doe 1 asked defendant to stop but he refused. Doe 1 had one nipple with a mole on it. Defendant told him it was his favorite nipple and he would try to lick it and blow on it.

On August 21, defendant grabbed Doe 1 by the throat and bent him over the desk in the cell. Defendant pulled down Doe 1's pants and put his penis in Doe 1's rectum. Defendant moved his penis back and forth. He told Doe 1, "you scream, I'll fuckin' beat you." He told Doe 1 that he would choke him. Defendant also told Doe 1, "shut up and take it like a man."

Defendant told Doe 1 that he could not "get off this way" and threw him on the floor. Defendant then ejaculated into the toilet. Doe 1 was bleeding from his rectum. Defendant forced Doe 1 to sleep on the floor so he could watch him and make sure he did not hit an emergency button that was in the cell. Doe 1 was scared and trembling. Defendant just laughed at him. Doe 1 was too scared to tell anyone what had happened.

On another occasion, defendant told Doe 1 they were going to bet on a football game and it was his "ass" that was on the line if his team lost. Doe 1 refused the bet but defendant ignored him. Doe 1's team lost and defendant told him "a bet is a bet, take it like a man." That night, defendant asked Doe 1 if he would rather slit his wrists or suck defendant's dick. Doe 1 told him that he would rather slit his wrists. He wanted to cut his wrists so he could get out of the cell. Defendant then sodomized Doe 1 again. Doe 1 was bleeding from his rectum again.

4

The following day, defendant promised Doe 1 that he would not touch him anymore. However, that night his attitude changed and he told Doe 1 he had to be disciplined. Defendant told him to get on the floor so he could be disciplined. Defendant again tried to choke Doe 1. While defendant was sodomizing Doe 1, he asked him if he liked "long strokes." Doe 1 was forced to sleep on the floor again. He was bleeding again.

After this third event, on August 24, a psychologist happened to come by their cell. Doe 1 told the psychologist that he was suicidal in order to get out of the cell. Doe 1 asked to talk to one of the sheriff's deputies and told the psychologist he had been "raped by my celly."

San Bernardino County Sheriff's Deputy Brett Haynes was assigned to the WVDC in August 2010. He responded to Doe 1's request to talk to a deputy. Doe 1 was taken to a hospital on that day to be examined by a sexual assault nurse. Doe 1 had bruising on his abdomen and left rib area. There were two tears in his rectal area. There was also an abrasion where the top layer of skin was taken off. The sexual assault nurse could not establish if the injuries were the result of consensual or non-consensual-sexual activity. However, the injuries were consistent with blunt force penetration activity.

Deputy Haynes spoke with defendant on August 24. Defendant admitted he and Doe 1 had been in a fight on August 3. He denied he committed sodomy on Doe 1 but said that he and Doe 1 engaged in "sex play." Defendant said they slapped each other on the buttocks.

5

Deputy Haynes advised defendant that Doe 1 had injuries consistent with being sodomized. Defendant explained that Doe 1 would sometimes discipline himself. Defendant told Deputy Haynes that Doe 1 had put a lotion bottle and deodorant bottle in his own "ass." Defendant explained this could have caused the injuries. Doe 1 had slept on the floor because he had injured his ribs while they were playing around wrestling.

Deputy Haynes spoke with defendant one week later. Defendant recalled at that time that there were two acts of sodomy but claimed that the acts were consensual. Defendant said that both of the acts involved bets on football games. They bet that if Doe 1's team lost, he would allow defendant to sodomize him.

Deputy Haynes explained that inmates were reluctant to report that they had been forcibly sodomized because they feared retaliation and that they would become a target for sodomy by other inmates. Doe 1 insisted he never consented to these acts. Doe 1 was in protective custody with defendant because Doe 1 had pleaded guilty in his case in exchange for testifying against his codefendants.

## 2. *Prior acts involving Doe 2*

John Doe 2 was in custody at the WVDC. He shared a cell with defendant prior to Doe 1 sharing a cell with defendant. Doe 2 admitted at trial that he and defendant had gotten into a fight while they were in the cell together. He claimed it was over "politics." Prior to the fight, they had gotten along well and read the Bible together. Doe 2 denied he was afraid of retaliation if he testified against defendant. Doe 2 also denied that defendant could be a member of Aryan Brotherhood claiming he was too young to be accepted.

Doe 2 adamantly denied that defendant sodomized him. Doe 2 was very aggressive and confrontational with the prosecutor. Doe 2 had tried to kill himself by slitting his wrists but he denied it had anything to do with defendant.

Deputy Haynes talked to Doe 2 in September 2010. Doe 2 told Deputy Haynes that he and defendant had been cell mates. Doe 2 believed that defendant was part of the Aryan Brotherhood and that put fear in him. Defendant forcibly sodomized Doe 2. Doe 2 was afraid that defendant would enlist the help of the Aryan Brotherhood on the outside of prison if he filed a complaint about it and his family would be hurt. Doe 2 began to tear up and was very emotional when he was speaking with Deputy Haynes. Doe 2 beat up defendant when he found out he was not a member of the Aryan Brotherhood.

Doe 2 talked to Deputy Haynes off the record and did not want to press charges against defendant. At the time of trial, Doe 2 was wearing a gold and red jumpsuit. Deputy Haynes explained the uniform was worn by inmates who have unpredictable behavior or "mental health issues."

7

B.    *Defense*

Deputy Forrest Wayne Pitts, Jr. worked at the WVDC in August 2010. He was assigned to the area where defendant's and Doe 1's cell was located. He did not recall ever receiving a panic call from the cell. Deputy Albert Ramirez also worked in the area where the cell occupied by defendant and Doe 1 was located. He did not recall Doe 1 ever requesting being moved from the cell. He did not recall a panic call from the cell during August 2010.

Deputy Shaun Wallen was also assigned to the same area. On May 3, 2010, he broke up the fight between defendant and Doe 2. Defendant had to be taken to the hospital because of his severe injuries.

## II

## *BRADY* VIOLATION

Defendant contends that the trial court abused its discretion by denying his motion for new trial based on his claim of a *Brady* violation for the prosecution's failure to disclose that Doe 2 had been declared mentally incompetent in his own trial proceedings prior to or contemporaneous to his testimony in the instant trial.

A.    *Additional Factual Background*

Prior to trial, defendant filed a motion for discovery. He specifically requested any mental health history information about Doe 2. Defendant filed a second motion for discovery. He requested any court filings pertaining to Doe 2.

On March 23, 2012, defendant filed a motion for new trial. In the motion, defendant alleged that the prosecution failed to disclose that prior to Doe 2's testimony in

8

this case, he had been declared mentally incompetent in a case before the San Bernardino County Superior Court. The evidence came from the court or law enforcement records to which the defense did not have access. The proceedings that declared him incompetent were prosecuted by a deputy district attorney from the San Bernardino County District Attorney's office. Instead of being transferred to Patton State Hospital, Doe 2 was kept in local custody and testified in this matter.

The prosecution filed opposition to the motion for new trial. The prosecution argued that the RAP sheet for Doe 2 was disclosed to defense counsel prior to trial. The RAP sheet for Doe 2 did not reference any case or matter where Doe 2 had been declared mentally incompetent. However, in a footnote, the prosecution stated, "[w]hile John Doe 2's RAP sheet printed on January 30, 2012 does not reference any case wherein he was declared mentally incompetent, we have been able to discover through the Superior Court "'Open Access'" system that John Doe 2 does have another case (FVI 801742) where the court found him mentally incompetent to stand trial on 10/03/2011. This case did not appear on John Doe 2's RAP sheet."

The prosecution stated that Doe 2 testified competently at trial, and defense counsel and the trial court never timely challenged his competency. Moreover, there was no prejudice to defendant because the results of the proceeding would have been the same. Doe 2 testified at trial that defendant was not violent and denied he ever assaulted him.

The prosecutor, Robert C. Bulloch, submitted a declaration that he had prosecuted defendant's case. Bulloch personally showed defense counsel an unredacted criminal

9

history, or RAP sheet, for Doe 2 which was printed on January 30, 2012. There was nothing on the RAP sheet that referenced he had been adjudged mentally incompetent. There was no reference to case number FVI 801742. Bulloch had no knowledge of the competency proceedings against Doe 2. Bulloch first became aware of the case when defense counsel disclosed it to him. The RAP sheet was attached to Bulloch's declaration.

A hearing was conducted on April 9, 2012. The trial court noted that it had read the motion for new trial and the opposition. The prosecutor noted that the file had been transferred from Victorville and the trial court acknowledged it had received the file. The trial court advised the parties that it had not looked at the file because a request to take judicial notice had not been made. The trial court noted that at some time either prior to or contemporaneous to the instant trial Doe 2 had been declared incompetent. The trial court believed that what was in the file was not important because the information raised in the motion was that he was declared incompetent and the deputy district attorney did not have knowledge of the case. Defense counsel argued that the San Bernardino County District Attorney's office prosecuted the case and that knowledge was imputed to Bulloch. Even if Bulloch chose not to make any inquiry, it did not absolve him of knowing the information. Defense counsel also argued that it was clear that Doe 2 had issues based on his detention in the competency ward at WVDC.

10

The trial court then asked defense counsel if he thought that Doe 2 appeared incompetent during his testimony. Defense counsel responded that he did not know that Doe 2 had been found incompetent. The trial court stated that it did not "wonder" about Doe 2's competence. The trial court noted that he was hostile but did not appear incompetent.

Defense counsel was concerned that Doe 2 was used to prove that defendant was a sexual predator. The trial court responded, "You would agree, would you not, that's not what John Doe Number 2 said?" Defense counsel agreed, "not exactly." The trial court noted that Doe 2's testimony actually was supportive of defendant's position. The trial court made clear there was no question of Doe 2's competency during the proceeding.

The prosecutor responded that defense counsel was provided Doe 2's RAP sheet. Defense counsel argued that Doe 2's testimony should not have been admitted at trial if he was in the process of a competency determination.

The trial court first noted that there was no "willful or intentional misleading or omission" by the prosecutor. Moreover, there was no prejudice. "The evidence was overwhelming." The trial court further stated, "[e]ven if John Doe Number 2 hadn't been here as provided by the victim in this case for the jury to make such a finding, you haven't asked me to overturn the verdicts or grant a new trial based on a lack of evidence if I excluded everything John Doe Number 2 said. But even if you had, I would deny that motion, because I think there was ample evidence for the jury to base its verdicts as it did with or without the testimony of John Doe Number 2." The motion for new trial was denied.

B.     *Analysis*

"The prosecution has a duty under the Fourteenth Amendment's due process clause to disclose evidence to a criminal defendant when the evidence is both favorable to the defendant and material on either guilt or punishment.  [Citations.]"  (*In re Miranda* (2008) 43 Cal.4th 541, 575.)

"In *Brady*, the United States Supreme Court held 'that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution.'  [Citation.]  The high court has extended the prosecutor's duty to encompass the disclosure of material evidence. . . ."  (*People v. Hoyos* (2007) 41 Cal.4th 872, 917-918, overruled on another ground in *People v. McKinnon* (2011) 52 Cal.4th 610.)  It is well established that "[t]here are three components of a true *Brady* violation:  The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued."  (*Strickler v. Greene* (1999) 527 U.S. 263, 281-282.)

"Favorable evidence is material when it "'could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.'"  [Citations.]  Put another way, the question is whether, deprived of the information withheld by the prosecution, the defendant received 'a trial resulting in a verdict worthy of confidence.'  [Citation.]"  (*In re Bacigalupo* (2012) 55 Cal.4th 312, 333.)

12

"On appeal, a trial court's ruling on a motion for new trial is reviewed under a deferential abuse of discretion standard. [Citation.] Its ruling will not be disturbed unless defendant establishes "a 'manifest and unmistakable abuse of discretion.'" [Citation.] Here, the asserted abuse of discretion is the asserted failure of the trial court to recognize violations of defendant's constitutional rights. Our constitutional analysis below therefore also addresses the abuse of discretion issue." (*People v. Hoyos, supra*, 41 Cal.4th at p. 917, fn. 27.) "A determination that the prosecution violated its disclosure obligations under *Brady* [], requires reversal without any need for additional harmless error analysis. [Citation.]." (*In re Bacigalupo, supra,* 55 Cal.4th at p. 334.)

Respondent concedes that the first two elements of a *Brady* claim have been established. We agree. The evidence was favorable to defendant in that it could be used to impeach Doe 2's testimony. Moreover, "[t]he circumstance that a prosecution witness faced pending criminal matters, some of which were being prosecuted by the same district attorney's office prosecuting the defendant, constitutes evidence 'favorable' to the defense, in that a jury could view this circumstance as negatively impacting the credibility of testimony by the witness that was helpful to the prosecution." (*People v. Letner* (2010) 50 Cal.4th 99, 176.)

We also agree with defendant that the People had an obligation to discover the information. The obligation under *Brady* is not limited to evidence the prosecutor's office itself actually knows or possesses but also includes "evidence known to the others acting on the government's behalf in the case, including the police." (*Kyles v. Whitley* (1995) 514 U.S. 419, 437.)

13

Hence, at issue here is whether the verdict is "worthy of confidence." (*In re Bacigalupo, supra,* 55 Cal.4th at p. 334.) We are convinced that even had Doe 2 been impeached, or not testified at all, the verdict would have been the same.

Initially, Doe 2's credibility was already questionable. ""In general, impeachment evidence has been found to be material where the witness at issue 'supplied the only evidence linking the defendant(s) to the crime' [citations], or where the likely impact on the witness's credibility would have undermined a critical element of the prosecution's case [citation].'" [Citation.]" (*People v. Letner, supra,* 50 Cal.4th at p. 177.)

Doe 2 was in a red and gold jumpsuit at the time he testified which signified he had some mental health issues. In fact, defense counsel argued to the jury as follows: "And I guess the last thing with respect to John Doe Number Two is, you know, being viewed as an unbalanced or a UB inmate, being either extremely violent or mentally imbalanced. And that's also a factor you should consider at some point in determining what credibility, what weight do you assign to John Doe Number Two. I'm not so sure where it fits, but he's a troubled man who's in jail who apparently can be extremely violent as proof by pounding on [defendant]." In addition, the prosecutor advised the jurors they could reject Doe 2's testimony and still convict defendant based on Doe 1's testimony, the sexual assault nurse and the testimony of Deputy Haynes. Doe 2 recanted his testimony at trial which certainly reflected on his credibility. If the jury had been informed that he had been found incompetent by another court it would not have cast the evidence in a different light as to impact the jury's finding of guilt.

14

Moreover, even if Doe 2 had not been allowed to testify, Doe 1 provided compelling testimony that defendant had sodomized him on three separate occasions. Doe 1 described each instance in detail. Deputy Haynes testified that inmates were reluctant to disclose that they had been sodomized for fear of retaliation or being victimized by other inmates. Doe 1 had no incentive to lie. Moreover, although the medical testimony did not prove that the sodomy was consensual or nonconsensual, it did corroborate Doe 1's testimony that the sodomy had occurred. Further, Doe 1 had other injuries — the bruises on his abdomen and rib area — that also corroborated Doe 1's testimony that defendant had thrown him on the ground.

Finally, defendant's explanation of Doe 1's injuries was clearly incredulous. Defendant first claimed that he had not sodomized Doe 1. Second, he claimed that Doe 1 placed items in his rectum on his own to discipline himself. On a third occasion, he admitted he had sodomized Doe 1, but claimed that it was consensual.

Based on the foregoing, defendant has failed to establish that the evidence that Doe 2 had been found incompetent by another court was material and therefore he cannot show a due process violation. As such, the trial court did not abuse its discretion by denying defendant's motion for new trial based on a *Brady* violation.

III

ADDITIONAL CLAIMS

Defendant contends in his second and third claims that he was entitled to an evidentiary hearing in the trial court regarding his *Brady* claim and that the trial court abused its discretion when it refused to consider relevant evidence in the court file pertaining to the incompetency proceeding against Doe 2.

We need not decide if he was entitled to an evidentiary hearing and find that there was no abuse of discretion in refusing to examine the court file because there was nothing more for the trial court to consider as to Doe 2's competency. The trial court essentially accepted that Doe 2 was found incompetent. Although the trial court did not agree with the assessment, it clearly accepted that another superior court had found Doe 2 incompetent. No further inquiry was necessary as the trial court accepted that Doe 2 had been found incompetent and defendant had failed to explain how any further evidence from the court file would have been admissible at trial.

Moreover, even had the trial court considered all of the evidence of Doe 2's competency, as set forth extensively *ante*, we do not believe the undisclosed evidence "reasonably could be taken to put the whole case in such a different light as to undermine confidence in the verdict." (See *In re Miranda*, *supra,* 43 Cal.4th at p. 575.) Doe 1's testimony was compelling, the medical testimony corroborated his testimony, and defendant's explanation was incredulous. As such, defendant's remaining claims lack merit.

16

IV

DISPOSITION

We affirm the judgment in its entirety.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

RICHLI
Acting P. J.

We concur:

KING
J.

MILLER
J.

17