Filed 9/10/25  P. v. Olaez CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | G062520 |
| v. | (Super. Ct. No. BAF1700381) |
| MANUEL SANDOVAL OLAEZ, | O P I N I O N |
| Defendant and Appellant. | |

Appeal from a judgment of the Superior Court of Riverside County, Valerie Navarro, Judge. Affirmed in part, reversed in part, and remanded.

Ronda G. Norris, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, A. Natasha Cortina and Alan L. Amann, Deputy Attorneys General, for Plaintiff and Respondent.

Manuel Sandoval Olaez appeals after a jury convicted him of first degree murder and attempted premeditated murder with true findings on gang-related firearm enhancements as to both counts and a gang-murder special circumstance as to the murder. Based on the special circumstance finding, the court sentenced Olaez to life imprisonment without the possibility of parole, and the court imposed additional terms for the firearm enhancement and attempted murder conviction.

Olaez contends his convictions and the attendant enhancements should be reversed because the prosecutor committed misconduct and his trial counsel rendered ineffective assistance. We reject both of these claims.

Olaez also raises multiple evidentiary and instructional issues concerning the gang-murder special circumstance. We conclude one of those issues requires us to vacate the true finding on gang-murder special circumstance and remand the matter for further proceedings. While Olaez's appeal was pending, the California Supreme Court decided *People v. Clark* (2024) 15 Cal.5th 743 (*Clark*), which explained Penal Code section 186.22, subdivision (f) (section 186.22(f); undesignated statutory references are to the Penal Code), requires the prosecution show "a connection, or nexus, between [a predicate] offense committed by one or more gang members and the organization as a whole." (*Clark*, at p. 762.) Because Olaez's jury was not instructed on this requirement and the absence of such an instruction was not harmless, the true findings on the gang-murder special circumstance and the gang-related firearm enhancements must be vacated.

We conclude Olaez's attempted murder conviction is supported by substantial evidence and reject his claim of cumulative error. We vacate Olaez's sentence and remand to the trial court for retrial, should the prosecution choose to retry the vacated special circumstance and

2

enhancements. In either event, the trial court should conduct a full resentencing hearing. Given that a new sentencing hearing will take place, we do not reach Olaez's claim concerning the restitution fine and other fees imposed at sentencing. In all other respects, we affirm.

PROCEDURAL HISTORY

In April 2019, Olaez and his brother Moses[1] were charged with the murder of Daniel Ramirez (§ 187, subd. (a); count 1) and the attempted deliberate and premeditated murder of R.M. (§§ 664 & 187, subd. (a); count 2). Firearm enhancements were alleged as to both counts. (§ 12022.53, subds. (d) & (e).) The information further alleged Olaez and Moses actively participated in a criminal street gang (§ 186.22, subd. (a); count 3), the murder was carried out by an active participant in a criminal street gang to further the activities of the gang (§ 190.2, subd. (a)(22)), and the attempted murder was committed for the benefit of a criminal street gang (§ 186.22, subd. (b)(1)(A)).

Prior to trial, the court granted Olaez's request to bifurcate the gang allegation as to the attempted murder charge and the substantive gang offense. The brothers were tried jointly before a single jury. At the close of the evidence, the court granted Moses's section 1118.1 motion, dismissed the murder and attempted murder counts as to him, and granted the prosecution's motion to dismiss the active gang participation charge as to Moses. The jury convicted Olaez of first degree murder and attempted murder and found true the gang-related firearm enhancements on both

---

[1] We refer to Moses by his given name to avoid confusion with appellant Olaez as the brothers share the same surname. No disrespect is intended.

3

counts, as well as the gang-murder special circumstance. After the jury returned these verdicts, Olaez admitted the gang enhancement as to the attempted murder charge. The court dismissed the active gang participation charge.

The court sentenced Olaez to prison for life without the possibility of parole for the murder conviction with the gang-murder special circumstance. The court also imposed a consecutive term of 25 years to life for the gang firearm enhancement on the murder conviction. As to the attempted murder conviction, the court imposed a concurrent sentence of 15 years to life and stayed the punishment for its firearm and gang enhancements. The court ordered Olaez to pay a $10,000 restitution fine (§ 1202.4) and imposed, but suspended, a parole revocation fine in the same amount. The court also imposed a court operations assessment (§ 1465.8, subd. (a)(1)) and criminal conviction assessment (Gov. Code, § 70373) on each charge.

FACTS

I.

PROSECUTION EVIDENCE

*A. The Events Prior to the Shooting*

On November 3, 2016, Ramirez and J.R. were hanging out and drinking alcohol. Both were members of the Southside Criminals gang. At a coffee shop, J.R., who was drunk, got into a verbal argument with a man and then with Olaez, who was a member of the Hemet Trece gang. Olaez did not reference his gang during the argument, did not have any weapons, and did not challenge J.R. to a fight. However, J.R. thought Olaez was going to fight him, so J.R. pulled out a knife and waved it around. J.R. believed Olaez had "beef" with him and wanted him dead because they previously had a falling

4

out when they were in juvenile hall together. Ramirez walked away from the argument.

Also that day, D.M. and his brother, R.M., were drinking at a park with Ramirez and Luis Barajas when J.R. got into a physical fight with "Little Man," another member of Hemet Trece. After the fight, J.R. and Little Man shook hands and everything seemed "cool" between them, according to D.M.

That night, J.R., Ramirez, Barajas, D.M., and R.M. continued drinking alcohol and smoking marijuana at a spot near the railroad tracks and aqueduct in Hemet. The area where they were hanging out is away from nearby streets and streetlights so they could not be seen from the road. It was particularly dark that night as there was little moonlight. There was frequent gang graffiti and activity in this area.

*B. The Shooting*

At trial, Hector Lopez testified he encountered Moses and Olaez while walking on the street around 8:00 or 9:00 p.m. that night.[2] The three of them continued to walk down the street when Lopez learned Moses and Olaez had been disrespected by someone. But Lopez told an officer in an April 2017 interview that he was walking with Moses when Olaez ran up and said he had been assaulted. The three of them then decided to go to the railroad tracks to confront the people that assaulted Olaez. Lopez made inconsistent statements as to whether he saw Olaez with a weapon as they were walking to the railroad tracks. Lopez told one of the investigators in April 2017 that

---

[2] Lopez was originally arrested and charged with murder in this case, along with Olaez and Moses. The charges against Lopez were dismissed and he testified at the preliminary hearing under a grant of immunity.

Olaez went to his house and got a firearm, which he concealed in his pant leg. At trial, however, Lopez testified he did not see Olaez go back to his house and get anything before they went to the railroad tracks and did not see Olaez with a weapon while they were walking.

As they were walking, Lopez heard Olaez yell, "'Where are you from?'" Lopez could not see who Olaez was yelling at because it was dark. As Olaez made the "hit-up," Lopez heard a gunshot. The shots were fired around 12:40 a.m. on November 4, 2016.

Lopez told an investigator in April 2017 that he saw Olaez fire a small rifle at a group of people near the railroad tracks. At trial, however, Lopez testified he did not see Olaez fire the gun and did not know from where the shots were fired.

Ballistics evidence showed Olaez fired multiple shots at the group using an M1 carbine rifle from about 275 feet away. One shot struck and killed Ramirez. Another hit R.M. in the side of his face, causing him to pass out.

When the shooting started, D.M. jumped down into the aqueduct. He did not see the shooter because it was dark. After the shooting stopped, he jumped out of the aqueduct and found his brother R.M. had been shot. D.M., R.M., and Barajas ran, trying to find safety and help. A nearby resident called 9-1-1 after D.M. and R.M. entered his backyard and pleaded for help. One of the responding officers asked R.M. who shot him, and someone can be heard on the officer's body-worn camera recording saying it was the guy from the "'park earlier.'" D.M. told an officer he did not see anyone coming before the shots were fired.

Hemet Police Department officers found a frightened and distraught Barajas in an area near the shooting. Barajas said he had been

6

hanging out and drinking with some friends near the aqueduct when three Hispanic males walked up and started "saying some gang signs." When Barajas and his friends started to walk away, they heard gunshots. After several minutes, Barajas walked two officers to the location where he and the others had been when the shooting occurred. They found Ramirez's body.

After the shooting, Lopez saw Olaez burn his clothes in a firepit and hide the rifle in the trunk of a car.

A Hemet Police Department investigator interviewed J.R. about six months after the shooting. J.R. told the investigator Hemet Trece shot Ramirez. He said he only saw one shooter, and he could not remember what the shooter said before the shooting started. J.R. was unwilling to name the shooter because he did not want to be labeled a snitch, but he wrote down Olaez's name as the person who could have shot at him. He thought he saw Olaez at the railroad tracks when the shooting occurred and that Olaez was alone. J.R. believed he was the intended target.

*C. Confidential Informant*

A few months prior to the shooting, the Riverside County gang impact team began working with Jane Doe, a paid confidential informant. Doe conducted numerous controlled purchases of narcotics or firearms. The month prior to the shooting, Doe made two controlled purchases of firearms that were facilitated by Moses.[3]

The morning after the shooting, Moses told Doe they needed to quickly get rid of a gun because it was "dirty." Based on conversations Doe

---

[3] These firearm sales were used as predicate offenses to prove the pattern of criminal gang activity for section 186.22 and will be discussed in more detail in the Discussion section, *post*.

heard between Moses and Olaez after the shooting, she believed they were involved, and she went to the police with this information. She believed the shooting was about someone tagging in the area and Moses was the shooter.

Doe continued to purchase firearms at the request of the gang impact team because they were hoping to find the murder weapon. About two weeks after the shooting, in a transaction involving Doe and another confidential police informant, Moses sold the M1 carbine rifle used in the shooting.

*D. Gang Evidence*

The prosecution presented evidence concerning Olaez and Moses's memberships in Hemet Trece and "La Raza Contro[la]" (LRC), which the prosecution's gang expert, David Hankins, testified were two independent but associated gangs in Hemet. (We further detail the gang evidence in the Discussion section, *post*.)

II.

DEFENSE EVIDENCE

Olaez was the only witness called by the defense. He denied being the shooter and testified he was at home with Moses the night the shooting occurred.

Olaez admitted he saw J.R. at a coffee shop before the shooting and J.R. pulled a knife on him during the encounter. It was the first time he had seen J.R. since they were in juvenile hall in 2009. During the argument at the coffee shop, J.R. pulled out a pocketknife. He did not open the blade but waved the knife at both Olaez and another guy. Olaez believed J.R. was drunk and Olaez told him to go with Ramirez, who had walked away. Ramirez said to J.R., "'Come on.'" J.R. left but yelled at Olaez as he did. Olaez did not know where J.R. and Ramirez were going and did not see them again.

8

Olaez denied being mad at J.R. but believed J.R. harbored ill feelings toward him. He did not know J.R. or Ramirez were in a gang.

The next morning, Lopez woke up Olaez. Lopez, whose nickname was Little Man, said he had gotten into a fight and "got messed up . . . at the wash." Doe walked into the room, and Lopez stopped talking. Later, Olaez concluded Lopez was talking about the shooting.

Olaez denied there were a lot of weapons at his house or being involved in any of Moses's gun transactions. Olaez never fired the M1 carbine rifle that was used in the shooting, and he was not with Moses when Moses sold it. However, Olaez admitted he previously had firearms when contacted by law enforcement. When he was arrested in January 2017, he was in possession of a shotgun. He was arrested again in February 2017, when he was the back seat passenger of a car that was pulled over, and a gun was found in the car.

## DISCUSSION

## I.

### PROSECUTORIAL ERROR

Barajas, a witness to the shooting, passed away in 2021, prior to Olaez's trial. Olaez contends the prosecutor committed prejudicial error by introducing evidence of Barajas's pretrial statements without first disclosing to the defense Barajas had died.[4] We reject this claim.

---

[4] Olaez contends the prosecutor committed prejudicial misconduct. "'[T]he term prosecutorial "misconduct" is somewhat of a misnomer to the extent that it suggests a prosecutor must act with a culpable state of mind. A more apt description of the transgression is prosecutorial error.'" (*People v. Centeno* (2014) 60 Cal.4th 659, 666–667.) Accordingly, we refer to it as prosecutorial error.

*A. Background*

Prior to trial, the prosecution filed a proposed witness list that included Barajas. During the trial, on the first day of witness testimony, the prosecutor presented the testimony of police officers Andrew Reynoso and Thomas Taitague, as well as detective Brian Wood (collectively, the officers) regarding Barajas's demeanor and statements after the shooting.

Reynoso talked to a "very distraught" Barajas shortly after the shooting. When Reynoso contacted him, Barajas was "seated in the fetal position, rocking back and forth" with a "ghost-like appearance." Barajas said his friend R.M. had been shot in the face by unknown males. Wood arrived and started talking to Barajas. Wood described Barajas as "visibly distraught." At this point, Barajas was standing but hunched over, crying, and had difficulty speaking. Barajas told Wood he was hanging out near the aqueduct and drinking with four other people when a group of three Hispanic males walked up and started "saying gang signs." Barajas and his group decided to leave, and as they were doing so, Barajas heard gunshots. Barajas described the three Hispanic males who approached as approximately 20 to 23 years old.

After a while, Barajas walked Reynoso and Taitague to the location where the shooting occurred, and they found Ramirez's body. Barajas collapsed to the ground and cried. Similar to the statement he made to Wood, Barajas told Reynoso he and some friends were hanging out and drinking near the railroad tracks when some unknown people shot at them.

Two court days after these officers testified regarding Barajas's statements, Olaez's counsel orally moved to strike Wood's testimony concerning Barajas's statement describing the shooters as three Hispanic males between the ages of 20 and 23. Defense counsel explained he expected

10

Barajas to testify at trial because Barajas was on the prosecution's witness list, and defense counsel planned to cross-examine Barajas regarding his statements. But the prosecution had just informed defense counsel Barajas had passed away. Defense counsel argued Barajas's statement describing the shooters was hearsay that did not fall under the spontaneous statement exception in Evidence Code section 1240. He asserted he would have objected to the testimony concerning Barajas's statements had he known Barajas was deceased.

The prosecutor contended he laid the foundation for Barajas's statements to be admitted as spontaneous statements, and therefore, they were properly admitted. The prosecutor did not address when he learned of Barajas's death or why he did not inform defense counsel of it prior to presenting Barajas's statements through the officers.

The court denied the defense request to strike the testimony, concluding Barajas's statements to the officers were spontaneous statements and admissible under the hearsay exception in Evidence Code section 1240.

*B. Analysis*

We question whether Olaez forfeited his claim of prosecutorial error by failing to raise it in the trial court. "It is well settled that making a timely and specific objection at trial, and requesting the jury be admonished . . . , is a necessary prerequisite to preserve a claim of prosecutorial misconduct for appeal." (*People v. Seumanu* (2015) 61 Cal.4th 1293, 1328; *People v. Hill* (1998) 17 Cal.4th 800, 820 [a defendant may not complain on appeal of prosecutorial error unless the defendant raised the issue in the trial court].)

Olaez acknowledges his trial counsel did not specifically object in the trial court on the grounds of prosecutorial error (or misconduct), but

11

nevertheless he contends his appellate claim was preserved because his counsel alerted the court to the underlying issue (the prosecutor's failure to inform defense counsel Barajas was unavailable as a witness because he passed away) and any objection would have been futile. He alternatively argues if his appellate claim was not preserved, his trial counsel rendered constitutionally deficient assistance by failing to make an objection on this ground in the trial court. We proceed to the merits of Olaez's claim and conclude even if the issue was preserved for appeal, it is without merit.

Olaez contends the prosecutor was required to disclose Barajas's death prior to eliciting evidence of Barajas's pretrial statements from the officers because Barajas's death was potentially exculpatory evidence. A prosecutor has a statutory (§ 1054.1) and constitutional duty to disclose material exculpatory evidence to the defense. (*In re Jenkins* (2023) 14 Cal.5th 493, 504; *Brady v. Maryland* (1963) 373 U.S. 83.) "Under the federal Constitution's due process clause, . . . the prosecution has a duty to disclose to a criminal defendant evidence that is '"both favorable to the defendant and material on either guilt or punishment"' [Citations]." (*In re Bacigalupo* (2012) 55 Cal.4th 312, 333.) "'[E]vidence is "material" within the meaning of *Brady* when there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different.' [Citations.] 'A "reasonable probability" of a different result' is one in which the suppressed evidence '"undermines confidence in the outcome of the trial."'" (*Turner v. United States* (2017) 582 U.S. 313, 324.)

Here, Olaez cannot show Barajas's death was material evidence. It is not reasonably probable the result of Olaez's trial would have been different if the prosecutor disclosed the death prior to presenting the officers' testimony because Barajas's statements to the officers would have been

12

admitted nevertheless under the spontaneous statements hearsay exception.[5] While the procedure may have been different, as the defense could have requested a hearing under Evidence Code section 402 regarding the admissibility of Barajas's statements, the result would have been the same, as the court concluded Barajas's statements were admissible as spontaneous statements. Barajas's death was not potentially exculpatory evidence as his statements to the officers would have been admitted even if the defense had been made aware of Barajas's death.

Furthermore, the record does not demonstrate prosecutorial error. "A prosecutor's conduct violates the federal Constitution when it "'so infect[s] the trial with unfairness as to make the resulting conviction a denial of due process.'" [Citation.] 'Conduct that does not render a trial fundamentally unfair is error under state law only when it involves ""the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury."'""" (*People v. Nadey* (2024) 16 Cal.5th 102, 156.)

---

[5] In his opening brief, Olaez did not directly argue Barajas's pretrial statements were inadmissible under Evidence Code section 1240. Instead, Olaez asserted "even assuming the statements were properly admitted under the hearsay exception, the prosecutor's failure to inform or disclose this potentially exculpatory information was misconduct." The Attorney General noted this statement and argued Olaez conceded Barajas's statements were properly admitted at trial under the hearsay exception. In his reply brief, Olaez denies he made any such concession. To the extent Olaez intended to separately raise an evidentiary issue concerning the admissibility of Barajas's statements, he did not do so in his opening brief because the issue was not raised "under a separate heading or subheading summarizing the point" and supported by citation of authority. (Cal. Rules of Court, rule 8.204(a)(1)(B); see *Tsakopoulos Investments, LLC v. County of Sacramento* (2023) 95 Cal.App.5th 280, 310 ["'Failure to provide proper headings forfeits issues that may be discussed in the brief but are not clearly identified by a heading'"].) Thus, we do not consider the evidentiary issue.

Olaez contends the prosecutor's conduct was intentional and deceptive. Our record is insufficient to conclude the prosecutor used deceptive or reprehensible methods by failing to disclose the news of Barajas's death before presenting his out-of-court statements. In the trial court, Olaez's trial counsel stated he believed the prosecutor learned of Barajas's death a few days prior to the officers' testimony. In responding to counsel's argument, the prosecutor did not address when he learned of Barajas's death. Even assuming the prosecutor erred, the error was harmless under state and federal constitutional standards given the overwhelming evidence of Olaez's guilt. (*People v. Rivera* (2019) 7 Cal.5th 306, 334.) Thus, we reject this claim of error.

## II.

### INEFFECTIVE ASSISTANCE OF COUNSEL CLAIM

Olaez contends his trial counsel rendered ineffective assistance because counsel did not request testimony concerning the Mexican Mafia be stricken and the jury appropriately admonished after counsel's objection to this evidence was sustained on one occasion. We disagree.

*A. Background*

The prosecutor elicited testimony concerning the Mexican Mafia from two witnesses. First, a deputy sheriff at the county jail testified Hispanic shot callers in Riverside County correctional facilities report to the Mexican Mafia. The deputy sheriff explained the Mexican Mafia is a gang that controls "every Hispanic gang south of Fresno, whether in the streets [or] in the jails." The witness further discussed how a shot caller in county jail is connected to Mexican Mafia members in state prison regarding the collection of money and assaults ordered within the jail. Olaez's counsel requested a sidebar and argued the testimony concerning the Mexican Mafia

14

and shot callers was irrelevant and prejudicial. The court agreed, and the prosecutor indicated he would "move away from the Mexican Mafia questions." Olaez's counsel did not request the testimony concerning the Mexican Mafia or shot callers be stricken or the jury be admonished not to consider the testimony.

In the second instance, the prosecution's gang expert was discussing the name Hemet Trece and testified "'Trece' is Spanish for 13" and the 13th letter of the alphabet is "M." He went on to explain the reference to the letter M is the gang paying homage to the Mexican Mafia and most Hispanic gangs in Southern California do the same. There was no objection to this testimony by the expert.[6]

*B. Analysis*

To succeed with his appellate claim, Olaez must establish a violation of his constitutional right to the effective assistance of counsel. (U.S. Const., 6th & 14th Amends; *Strickland v. Washington* (1984) 466 U.S. 668, 687–688.) "An ineffective assistance of counsel claim has two elements: a defendant must show that their counsel's performance was deficient, *and* that this deficient performance prejudiced the defense. [Citation.] A reviewing court can begin an ineffective assistance of counsel inquiry with either element and need not address both elements if one is not satisfied. [Citations.] Indeed, it is often preferable for a court to dismiss an ineffective

---

[6] In his briefing, Olaez cites another instance where the gang expert mentioned the connection between the number 13 and the Mexican Mafia. This testimony was elicited by Olaez's trial counsel, not the prosecutor. We, therefore, do not consider it in analyzing his appellate claim that his counsel should have requested the jury be admonished not to consider this evidence.

15

assistance of counsel claim solely for lack of prejudice. [Citations.] To satisfy *Strickland*'s prejudice prong, a defendant 'must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" (*In re Tellez* (2024) 17 Cal.5th 77, 88.)

Beginning our analysis with the prejudice element, we conclude Olaez has not shown it is reasonably probable the result of his trial would have been different if the testimony concerning the Mexican Mafia had been stricken and the jury admonished not to consider it.[7] The two witnesses' testimony did not directly connect Olaez to the Mexican Mafia, as these witnesses testified only generally about the connection between Hispanic gangs in Southern California and the Mexican Mafia. This limited evidence was not prejudicial to Olaez. In his testimony, Olaez admitted he was a member of the Hemet Trece gang. The brief testimony concerning the connection between Southern California Hispanic gangs, which includes Hemet Trece, and the Mexican Mafia added nothing prejudicial. It had no bearing on any material issue concerning whether Olaez committed the murder and attempted murder or whether he did so with the intent to benefit Hemet Trece. There was strong evidence establishing Olaez was the shooter at the time Ramirez was killed and R.M. was injured. Considering the strong case against Olaez and the minimal potential for prejudice from the Mexican Mafia testimony, it is not reasonably probable the jury would have reached a

---

[7] Olaez's trial counsel did not object to the gang expert's testimony concerning the Mexican Mafia. Thus, as to this evidence, we construe his appellate claim to be his counsel rendered ineffective assistance by failing to object, as well as failing to request the testimony be stricken and the jury admonished not to consider it.

verdict more favorable to Olaez if the testimony concerning the Mexican Mafia had been stricken and the jury admonished not to consider it. Accordingly, we reject Olaez's claim of ineffective assistance of counsel.

III.

GANG-MURDER SPECIAL CIRCUMSTANCE

Olaez raises both insufficient evidence and instructional error claims concerning the gang-murder special circumstance. Initially, he raises multiple challenges to the sufficiency of the evidence the prosecution presented to prove that when the murder was committed he was an active participant in a criminal street gang as defined in section 186.22(f). (§ 190.2, subd. (a)(22).) First, he contends he was a member of Hemet Trece, the predicate offenses the prosecution used were committed by a member of LRC, and the prosecution failed to prove an organizational connection between Hemet Trece and LRC as required under *People v. Prunty* (2015) 62 Cal.4th 59 (*Prunty*). Second, he asserts the prosecution failed to prove the predicate offenses benefited the gang in a way that was more than reputational. Third, he argues the evidence failed to show the predicate offenses satisfied the requirement in section 186.22(f) that the gang's "members collectively engage in . . . a pattern of criminal gang activity."

He also raises multiple claims concerning the instructions provided to the jury. First, he argues the jury was improperly instructed on the element of "'a pattern of criminal gang activity,'" as used in section 186.22(f). (Boldface omitted.) Second, he contends the jury was improperly instructed on one of the offenses it could consider as a predicate offense in determining whether the prosecution established a pattern of criminal gang activity by Hemet Trece members. Third, he asserts the jury was erroneously instructed it did not have to unanimously agree as to which predicate

17

offenses it relied on to determine a pattern of criminal gang activity had been established.

The Attorney General counters substantial evidence supports the gang-murder special circumstance finding and any instructional error was harmless. We vacate the gang-murder special circumstance because *Clark, supra*, 15 Cal.5th 743 altered the evidentiary showing required to establish the collective engagement element of a criminal street gang. *Clark* was decided after Olaez's trial, and therefore, the prosecution did not present evidence to prove this organizational nexus requirement and the jury was not instructed on it.

*A. Gang-murder Special Circumstance*

Section 190.2 authorizes the death penalty or imprisonment for life without the possibility of parole for a defendant convicted of first degree murder if the jury finds "[t]he defendant intentionally killed the victim while the defendant was an active participant in a criminal street gang, as defined in subdivision (f) of Section 186.22, and the murder was carried out to further the activities of the criminal street gang." (§ 190.2, subd. (a)(22); accord, *People v. Lamb* (2024) 16 Cal.5th 400, 420, fn. 6 (*Lamb*); *People v. Rojas* (2023) 15 Cal.5th 561, 565.) Thus, proof of the existence of a criminal street gang as defined in section 186.22(f) is a prerequisite to proving the gang-murder special circumstance. (*Rojas, supra*, 15 Cal.5th at p. 569; *People v. Rodriguez* (2022) 75 Cal.App.5th 816, 823.)

Prior to Olaez's trial, the Legislature passed Assembly Bill No. 333 (2021–2022 Reg. Sess.) (Assembly Bill 333) (Stats. 2021, ch. 699, § 1), which made multiple changes to section 186.22. (See *People v. Rojas, supra*, 15 Cal.5th at pp. 566–567 [describing four changes].) "As amended by Assembly Bill 333, section 186.22 defines the term "'criminal street gang'" to

18

mean 'an ongoing, organized association or group of three or more persons, . . . whose members *collectively* engage in, or have engaged in, a pattern of criminal gang activity.' [Citation.] The amended statute defines the "'pattern of criminal gang activity,'" in turn, to mean, in pertinent part, the commission of (or other specified forms of involvement in) two offenses enumerated in the statute, 'provided . . . [they] were committed *on separate occasions or by two or more members*' of the gang and the offenses provided a benefit to the gang that is more than reputational. (§ 186.22, subd. (e)(1), italics added (section 186.22(e)(1)).)" (*Clark, supra,* 15 Cal.5th at p. 749.) "'The offenses comprising a pattern of criminal gang activity are referred to as predicate offenses.'" (*Lamb, supra,* 16 Cal.5th at p. 444, fn. 15.) We discuss these definitions in greater detail as we analyze Olaez's contentions.

We begin with Olaez's contentions the evidence was insufficient to support the gang-murder special circumstance. We review the sufficiency of the evidence to support the gang-murder special circumstance under the substantial evidence standard, making sure "the record demonstrates substantial evidence to establish guilt beyond a reasonable doubt." (*People v. Renteria* (2022) 13 Cal.5th 951, 970.) "'When reviewing the sufficiency of evidence to support a special circumstance, the relevant inquiry is "'whether, after viewing the evidence in the light most favorable to the People, *any* rational trier of fact could have found the essential elements of the allegation beyond a reasonable doubt.'" [Citation.] We presume in support of the judgment the existence of every fact the trier of fact reasonably could infer from the evidence.' [Citation.] "'"If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also be reasonably reconciled with a contrary finding

does not warrant a reversal of the judgment.""""" (*People v. Thomas* (2023) 14 Cal.5th 327, 377–378.)

*B. Gang Evidence Presented at Trial*

1. Hemet Trece

Hankins, an investigator with the Riverside County District Attorney's Office, testified as the prosecution's gang expert. Starting in 2005 or 2006, he worked as a member of the Riverside County regional gang task force and was assigned to the Hemet and San Jacinto areas for more than a decade. During the time he worked there, there were two major Hispanic gangs in the area: Hemet Trece and San Jacinto.

Hemet Trece is the oldest Hispanic gang in Hemet. The gang's territory encompasses the entire city of Hemet and some outlying areas. Hankins testified Hemet Trece is the "primary" or "umbrella" gang and "[t]here are several offshoots," including LRC, Southside Criminals, and Hemet Crazy Ones. According to Hankins, at the time of the shooting, the offshoots or subsets were independent and constituted "their own individual gang that associated with Hemet Trece." Typically, the subset gangs under the umbrella gang were allies, but disputes arose between the subsets under the umbrella.

In 2016, there were 50 documented members of Hemet Trece and about 20 documented members of LRC. Hankins testified that at the time of the shooting, LRC and Hemet Trece were ongoing organizations.

In 2009, Olaez completed a gang registration form and registered as a member of Hemet Trece. When stopped by law enforcement in January 2017, he had Hemet Trece tattooed on his torso and a large "H" tattooed on his arm. Olaez was listed as a member of Hemet Trece on a roll call "kite"

20

found in the county jail in April 2017, while he was in custody pending trial.[8] Based on his training and experience, Hankins opined Olaez was "a gang member connected to the Hemet Trece and [LRC] gangs" at the time of the shooting in November 2016. Hankins rendered this opinion despite acknowledging there was not one piece of indicia indicating Olaez was a member of LRC.

A couple of months before the shooting, Moses and a member of LRC were photographed making an "H" symbol with their hands. This signified they were claiming the city of Hemet. Based on this photograph, a field identification card was completed by a member of the county gang task force indicating Moses was a member of LRC. Another field identification card was completed for Moses after the shooting that indicated Moses had a tattoo of the logo for the St. Louis Cardinals baseball team on one side of his head. This tattoo represented the Locotes clique of Hemet Trece. At one point in his testimony, Hankins opined Moses was an LRC gang member in November 2016, but he later opined Moses was "a Hemet Trece/La Raza gang member" in the same timeframe.

Olaez and Moses lived in the same house, and Hemet Trece and LRC operated in their neighborhood. Hankins believed both Olaez and Moses were active participants in LRC at the time of the shooting. Hankins testified every LRC member might be Hemet Trece but not every Hemet Trece member is LRC. Yet, he also testified Hemet Trece and LRC "are synonymous."

---

[8] A roll call is a sheet of paper with the name, booking number, gang, next court date, and offense for "every Hispanic" in custody at the county jail. A "kite" is a roll call or other writing "folded up to try to elude law enforcement detection."

Hankins had investigated over 50 crimes by Hemet Trece, including felony assaults, firearm possession, stolen vehicles, narcotics sales, and graffiti. He believed these offenses to be an ongoing pattern of criminal activity in 2016.

Hankins described signs or symbols associated with Hemet Trece, which include the word "'Hemet'" and the number "13." The symbols used for Hemet Trece are often used in conjunction with other gangs such as LRC. The symbols associated with LRC are similar, but LRC also has its own unique ones.

Hankins testified regarding the importance of respect in gang culture generally. He also explained a disrespected gang member is expected by his fellow gang members to seek revenge or retribution when the member is disrespected

At trial, Olaez admitted he was a member of Hemet Trece at the time of the shooting. Drawings he made that were found during a search in 2009 had "'LS'" at the bottom of the picture, which stands for "Locotes," a clique of Hemet Trece. Olaez denied he was ever a member of LRC, which is a separate gang.

2. Predicate Offenses

To prove the gang allegations, the prosecution presented evidence of two predicate offenses: a gun sale facilitated by Moses on October 11, 2016 and a second gun sale facilitated by Moses on October 20, 2016.[9]

On October 11, 2016, Hankins was part of the surveillance team when Doe conducted a controlled purchase of firearms in Hemet. Doe picked up Fernando Flores, and they drove to the house where Olaez and Moses lived. Flores entered the house and returned with Moses, who directed Doe to drive to a nearby auto repair shop. At the auto repair shop, Andrew Crawford arrived in a vehicle with firearms, which were then loaded into Doe's car. Crawford received the money for the firearms, and Doe paid Moses and Flores each a $100 "finder's fee" for facilitating the transaction. Olaez was not involved in the transaction.

Nine days later (October 20, 2016), Doe made another controlled purchase of firearms at the auto repair shop. Again, Moses facilitated the transaction, in which Crawford arrived with four firearms and they were sold to Doe. During this sale, Moses referenced his gang affiliation and tattoos and said he was "willing to die for respect." Hankins believed Moses was

_____

[9] The prosecution also presented evidence of a 2011 vehicle theft by members of LRC. However, as the Attorney General commendably points out, the 2011 vehicle theft could not serve as a predicate offense because it does not satisfy the requirement in section 186.22(e)(1) that a predicate offense occur within three years of the prior predicate offense. The Attorney General notes: "The vehicle theft falls outside this three-year window, as it occurred almost five years prior to the next predicate offense—the October 16, 2016, firearms sale—and accordingly, it could not serve as a predicate offense. (See *Clark, supra*, [15 Cal.5th at p. 765] fn. 7 [offenses falling outside this three-year requirement may not serve as a predicate offense].)" Thus, we, like the parties, focus on the two other predicate offenses in analyzing the appellate issues, as the 2011 vehicle theft is not a viable predicate offense.

23

trying to intimidate Doe. Doe paid Cesar Delrio for the guns. Olaez was not involved in the sale but may have been standing in front of the building.

3. Primary Activities

Hankins testified the sale of firearms was one of the primary activities of Hemet Trece and LRC in 2016. He explained: "The sale of firearms benefits a gang on a couple different levels. Number one, it allows people who are affiliated or associated with these people to know that . . . they can get firearms. Number two, they can get multiple firearms. Individuals typically who have access to these types of firearms are people who are willing to use them. Moving guns around, not just to my informant but to gang members in any gang, allows them to use them as tools to either defend their neighborhood or commit other crimes, like robberies, or protect their narcotics investments, or just to keep what they perceive as keeping their neighborhood safer. [¶] Also too, sometimes they'll sell firearms to get rid of firearms that were used in a crime . . . ." He also testified a person selling, carrying, or using guns would gain respect and improve their reputation within the gang.

4. Expert Opinion

The prosecutor asked Hankins how a homicide committed in retaliation for an LRC or Hemet Trece gang member being jumped or disrespected would benefit LRC or Hemet Trece. Hankins responded it would benefit "on numerous levels. Number one, other gang members are going to know, hey, LRC, they're violent, that they're not going to take being disrespected. Number two, the neighborhood knows the gangs in the neighborhood. They're not going to testify if they see something because they still have to live in the neighborhood. . . . So it makes it very difficult for law enforcement to prosecute these cases with no witnesses. [¶] Also too, it . . .

24

shows the new gang members that may be how the gang works. . . . [I]t helps them [with] recruiting and retention and, quite honestly, safety. Because if people know this gang shoots people, they're less likely to challenge them."

Hankins opined, in response to the prosecutor's hypothetical, that where a LRC "gang member [was] disrespected in some sort of altercation," and the disrespected gang member tells another gang member they were to "confront the situation," the "entire incident" would be "in association with Hemet Trece or [LRC]." He explained: "It's just the way it has to happen. That's why you're in a gang: to help elevate your respect level, also to let other people know that you can't assault gang members when they're by themselves. It's completely expected."

*C. Evidence of a Single Criminal Street Gang*

In *Prunty*, the California Supreme Court explained section 186.20 et seq. "requires that the gang the defendant sought to benefit, the individuals that the prosecution claims constitute an 'organization, association, or group,' and the group whose actions the prosecution alleges satisfy the 'primary activities' and predicate offense requirements of section 186.22(f), must be one and the same." (*Prunty, supra*, 62 Cal.4th at pp. 75–76.)

Olaez contends the prosecution failed to prove the existence of a single criminal street gang, a requirement discussed in *Prunty, supra*, 62 Cal.4th 59. He asserts the evidence demonstrated he was a member of Hemet Trece, not LRC, but the predicate offenses relied on by the prosecution were committed by Moses, who was a member of LRC, and the prosecution failed to establish an organizational connection between LRC and Hemet Trece. The Attorney General does not assert there is substantial evidence

25

Olaez was a member of LRC.[10] Instead, the Attorney General argues there is substantial evidence Moses was a member of Hemet Trece, the same gang as Olaez, and Moses committed the predicate offenses, thereby negating the necessity of showing an organizational connection between Hemet Trece and LRC. We agree with the Attorney General.

There was undisputed evidence at trial Olaez was a member of Hemet Trece. Indeed, Olaez admitted in his trial testimony he was a member of Hemet Trece at the time of the shooting. While there was a significant amount of evidence showing Moses was a member of LRC, we find sufficient evidence establishing he was also a member of Hemet Trece.

Moses had "Hemet" tattooed on his right forearm, which one of the prosecution's witnesses testified signified he claimed the City of Hemet as his gang territory. About two months before the shooting, Moses posted a photograph on social media with a known member of LRC, in which both were making "H" symbols with their hands. One of the prosecution's witnesses from the gang task force testified the "H" hand symbol they made was "used by gang members claiming Hemet." A roll call discovered while Moses was in custody after the shooting listed Moses as a member of Hemet Trece. While Hankins opined Moses was a member of LRC, he also opined Moses was a member of both LRC and Hemet Trece at the time of the shooting. Hankins explained all LRC members are also members of Hemet Trece because Hemet Trece is the "umbrella organization."

---

[10] The Attorney General notes the trial court granted the defense motion to dismiss (§ 1118.1) the active gang participation charge (count 3) that alleged Olaez was a member of LRC.

The information did not allege a particular street gang for the gang-murder special circumstance.

26

Moreover, additional evidence indicates Moses and Olaez were in the same clique of Hemet Trece. Moses had a tattoo on the side of his head representing the Locotes clique of Hemet Trece. Olaez was also connected to the Locotes clique of Hemet Trece through drawings he made when he was younger.

Because there was sufficient evidence establishing Moses and Olaez were members of Hemet Trece, and Moses committed the predicate offenses, the prosecution did not need to establish the organizational connection between Hemet Trece and LRC. Accordingly, this portion of Olaez's claim fails.

*D. Common Benefit*

Olaez contends the gang-murder special circumstance is not supported by substantial evidence because the prosecution failed to prove the predicate offenses benefited the gang in a way that was more than reputational. We disagree.

As amended by Assembly Bill 333, section 186.22 requires the prosecution prove the predicate offense "commonly benefited a criminal street gang, and the common benefit from the offenses is more than reputational." (§ 186.22(e)(1); *Clark, supra*, 15 Cal.5th at pp. 752, 757.) Subdivision (g) of section 186.22 provides examples of common benefits that are more than reputational: "financial gain or motivation, retaliation, targeting a perceived or actual gang rival, or intimidation or silencing of a potential current or previous witness or informant."

Hankins testified one of the primary activities of Hemet Trece and LRC was the sale of firearms. He further testified firearm sales, like the two sales Moses facilitated in October 2016, benefit a gang in a couple ways. First, the sale of firearms provides access to firearms, which gang members

27

can use to "defend their neighborhood or commit other crimes" or keep their neighborhood safer. Second, selling firearms benefits a gang when it needs to get rid of guns used in a crime, as the sale makes it more difficult for law enforcement to connect the firearm to the crime.

Olaez asserts Hankins's opinion testimony concerning the common benefits to a gang in selling firearms lacked any evidentiary value because they were "conclusory opinions based on speculation." We disagree. Substantial evidence supported the finding the firearm sales benefited Olaez, a member of Hemet Trece, in a way that was more than reputational. Moses's facilitation of firearm sales provided Olaez access to the rifle he used in the shooting. Moses later sold the gun used in the shooting, knowing it was "dirty" and they needed to get rid of it. These were more than reputational benefits.

*E. Remand is Required Based on* Clark

While this appeal was pending, the California Supreme Court decided *Clark, supra*, 15 Cal.5th 743. *Clark* addressed "the requirements for proving the predicate offenses constituting a 'pattern of criminal gang activity'—one of the requirements for proving the existence of a 'criminal street gang.'" (*Id.* at p. 749.) In doing so, the Supreme Court analyzed the language in section 186.22, subdivisions (e)(1) and (f).

Section 186.22(e)(1) defines a ""'pattern of criminal gang activity'"" as meaning "in pertinent part, the commission of (or other specified forms of involvement in) two offenses enumerated in the statute, 'provided . . . [they] were committed *on separate occasions or by two or more members*' of the gang." (*Clark, supra*, 15 Cal.5th at p. 749.) In *Clark*, the California Supreme Court concluded the plain language of section 186.22(e)(1) does not require the predicate offenses be committed in concert

28

with other gang members but can "be committed by individual gang members acting alone." (*Clark*, at p. 749.) Olaez acknowledges this holding renders nonviable his original claim that section 186.22 requires the prosecution to show each predicate offense was committed by two or more gang members.

But in *Clark*, the California Supreme Court also addressed the meaning of the "collective engagement requirement" (*Clark, supra*, 15 Cal.5th at p. 749) in section 186.22(f). It determined the collective engagement requirement in subdivision (f) has an "independent significance, separate and apart from the requirements for proving predicate offenses in section 186.22, subdivision (e), such as the requirement to prove a common benefit to the gang." (*Clark*, at p. 759.) The Supreme Court held "that collective engagement requires a nexus between the individual predicate offenses and the gang as an organized, collective enterprise. This organizational nexus requirement is satisfied by showing a connection between the predicate offenses and the organizational structure, primary activities, or common goals and principles of the gang." (*Ibid.*) The Supreme Court explained: "[A] singular focus on the common benefit requirement in section 186.22, subdivision (e) does not prove the existence of a criminal street gang as defined in section 186.22(f). The fact that a crime may have commonly benefited a gang certainly tells us something about the relationship between the perpetrator and the gang, but it does not necessarily tell us how the gang itself can be said to have 'collectively engaged' in a pattern of crime. The Attorney General acknowledged that after proving that a predicate offense conferred a common benefit on the gang, it is still necessary to show that the offense reflected an 'organized effort' by the criminal street gang. The Legislature's reference to collective engagement thus calls for an inquiry not just into how the predicate offenses benefited the gang, but also how the gang

29

works together *as a gang*. It calls for a showing of a connection, or nexus, between an offense committed by one or more gang members and the organization as a whole." (*Id.* at pp. 761–762.) "This organizational nexus may be shown by evidence linking the predicate offenses to the gang's organizational structure, meaning its manner of governance; its primary activities; or its common goals and principles." (*Id.* at p. 762.)

The *Clark* court recognized the required collective engagement could be "established in different ways." (*Clark, supra*, 15 Cal.5th at p. 762.) "[C]ollective engagement might be shown by demonstrating that the offenses are reflective of the primary activities of the gang, or else adhere to a common goal or plan characteristic of the gang in question." (*Ibid.*) Providing examples of collective engagement, the Supreme Court stated: "[T]here might be evidence of a direct order from the gang to commit specific crimes. [Citations.] Alternatively, evidence might show a more general, well-understood expectation that members must engage in certain types of offenses. [Citation.] In other cases, collective engagement might be shown by demonstrating that the offenses are reflective of the primary activities of the gang, or else adhere to a common goal or plan characteristic of the gang in question." (*Ibid.*)

"The core inquiry is whether there exists an organizational nexus between the crime and the gang. . . . [T]his is conceptually distinct from the requirement to prove that each predicate offense 'commonly benefited' the gang (§ 186.22(e)(1)), even though the facts necessary to prove the two requirements will often overlap with one another." (*Clark, supra*, 15 Cal.5th at p. 763.) *Clark* fundamentally altered the showing required to establish the collective engagement element.

Because *Clark* was decided after Olaez's trial, the jury was not instructed on the collective engagement requirement as articulated in *Clark*. Thus, unless we can conclude the lack of instruction on this newly clarified requirement was harmless beyond a reasonable doubt, Olaez is entitled to a remand for further proceedings on the gang-murder special circumstance. (*Clark, supra,* 15 Cal.5th at p. 763; *Lamb, supra,* 16 Cal.5th at p. 448; *People v. Tran* (2022) 13 Cal.5th 1169, 1207.) Based on the record before us, we cannot conclude the error was harmless.

"In this assessment, we 'conduct a thorough examination of the record. If, at the end of that examination, [we] cannot conclude beyond a reasonable doubt that the jury verdict would have been the same absent the error—for example, where the defendant contested the omitted element and raised evidence sufficient to support a contrary finding—[we] should not find the error harmless.' [Citation.] Conversely, where we conclude 'beyond a reasonable doubt that the omitted element was uncontested and supported by overwhelming evidence, such that the jury verdict would have been the same absent the error, the erroneous instruction is properly found to be harmless.'" (*Lamb, supra,* 16 Cal.5th at p. 449.)

The Attorney General contends the absence of a jury instruction on the organizational nexus requirement in section 186.22 is harmless "in light of the evidence resoundingly showing that the predicate offenses were connected to Hemet Trece." (Boldface and capitalization omitted.) We disagree. "'In assessing prejudice in this context, the question is not whether there is evidence in the record that would support a jury finding of the missing element. Instead, we ask whether we can conclude beyond a reasonable doubt that "the jury verdict would have been the same" had the jury been instructed on the missing element.' [Citations.] 'Our task, then, is

31

to determine "whether the record contains evidence that could rationally lead to a contrary finding with respect to the omitted element.""""(*Lamb, supra*, 16 Cal.5th at p. 449.)

Here, the prosecution's gang expert testified one of the primary activities of Hemet Trece was the sale of firearms, and this activity benefited the gang in multiple ways. But the prosecution did not establish a nexus between the predicate offenses committed by Moses and Hemet Trece as a collective enterprise. The record contains evidence that could rationally lead to a finding Moses facilitated the firearm sales used for the predicate offenses for his own benefit and not as part of how Hemet Trece works together as a gang. There was no evidence any of the other individuals taking part in these firearm sales were members of Hemet Trece (or LRC for that matter). Moreover, because the prosecution chose to present two predicate offenses committed by a single gang member within two weeks, they did not show "how the gang itself can be said to have 'collectively engaged' in a pattern of crime." (*Clark, supra*, 15 Cal.5th at pp. 761–762.) There is no evidence in the record Hemet Trece members were directed or encouraged to engage in the sales of firearms or worked together to sell firearms. The record shows Moses received a $100 finder's fee for facilitating the firearm sale used as the first predicate offense and the money for the second sale was paid to a different person. Based on this evidence, a rational juror could conclude a nexus had not been established between the predicate offenses and Hemet Trece as a collective enterprise. (*Id.* at p. 764.) While Olaez, Moses's brother, benefited from Moses's access to firearms, there is no evidence any other Hemet Trece members did.

Thus, the absence of *Clark*'s organizational nexus requirement in the jury instructions was not harmless beyond a reasonable doubt.[11] The true finding on the gang-murder special circumstance must be vacated and the matter remanded for further proceedings during which the prosecution may elect to retry the special circumstance. (*Clark, supra*, 15 Cal.5th at p. 764.)

This instructional error also requires the gang-related firearm enhancements on both counts be vacated. The jury was instructed consistent with CALCRIM No. 1402 that they must find Olaez committed the crimes charged in counts 1 and 2 "for the benefit of, at the direction of, or in association with a criminal street gang," before deciding whether the prosecution had proven the firearm enhancements. Because the jury was not properly instructed on the elements of a criminal street gang, the gang-related firearm enhancements (§ 12022.53, subd. (e)) must be vacated. The prosecution may elect to retry these enhancements as well.

IV.

ATTEMPTED MURDER

At our request, the parties briefed whether the evidence was sufficient to support Olaez's conviction for the attempted premeditated and deliberate murder of R.M. Olaez contends his attempted murder conviction must be reversed, and the Attorney General argues the evidence is sufficient to prove the conviction. With the benefit of the parties' briefing, we conclude a rational jury could have concluded beyond a reasonable doubt Olaez was guilty of the attempted premeditated murder of any person in the group at the aqueduct, which included R.M. Thus, we affirm this conviction.

---

[11] Because we conclude there is prejudicial instructional error on this ground, we do not reach Olaez's other claims of instructional error.

33

*A. Background*

The district attorney charged Olaez with the attempted premeditated and deliberate murder of R.M.

During the jury instruction conference, the court and the parties discussed the instructions to be provided the jury on attempted murder, and the prosecutor indicated he was not proceeding under a "kill zone theory." The prosecutor stated: "[T]he People's theory of the case is that . . . Olaez's target was [J.R.], also known as 'Suspect.' So the fact is that he went down there and he fired a couple of shots at a group of people. He believed that [J.R.] was possibly in that area. [¶] I don't believe he had the intent to kill everyone in that area." The prosecutor withdrew his request for the kill zone portion of the attempted murder instruction (CALCRIM No. 600).

Based on the prosecutor's representation, the court did not instruct the jury on the kill zone theory. As to the murder charge, the court instructed the jury on transferred intent (CALCRIM No. 562). But the instruction on transferred intent also informed the jury it did not apply to attempted murder.

As to the attempted murder charge, the jury was instructed Olaez was charged with attempted murder and before it could find Olaez guilty of this charge, the prosecution must prove: "1. The defendant took at least one direct but ineffective step toward killing another person";  and "2. The defendant intended to kill a person." (CALCRIM No. 600.)

In his closing argument to the jury, the prosecutor referred the jury to CALCRIM No. 562 on transferred intent with respect to the first degree murder charge and the special circumstance allegation. The prosecutor argued CALCRIM No. 562 "talks about the fact that if you find . . . Olaez when he went down to the train tracks that day and his beef

34

with [J.R.] because of that entire incident at the [coffee shop], if he has the intent to kill [J.R.] at the train tracks that day and in the process he accidentally kills . . . Ramirez, his intent, that state of mind, 'I'm going to kill [J.R.]' is transferred to the person that was actually killed." The prosecutor continued by asserting the evidence showed Olaez intended to kill J.R. that day.

Soon thereafter, the prosecutor discussed the attempted murder charge and told the jury "it's a similar analysis to what we just went through with the murder of . . . Ramirez. This just applies to [R.M.]" After stating the elements in the attempted murder instruction (CALCRIM No. 600), the prosecutor argued: "[Olaez] fired that gun at this group of five men, knowing that if he fired that gun, if he took that intentional step, that not only would possibly [J.R.] be killed, but the other four men that were with him. And in the process, he killed  . . .  Ramirez, and in the process with that same intent with that same mind-set, he shot and caused great bodily injury to [R.M.]"

In his rebuttal argument, the prosecutor asserted Olaez had "beef" with J.R. and J.R. "was, in fact, the target at the railroad tracks."

*B. Governing Principles*

"To prove the crime of attempted murder, the prosecution must establish 'the specific intent to kill and the commission of a direct but ineffectual act toward accomplishing the intended killing.'" (*People v. Canizales* (2019) 7 Cal.5th 591, 602.) While attempted murder requires a specific intent to kill, murder does not because it can be supported by implied malice. (*People v. Mumin* (2023) 15 Cal.5th 176, 190.) Because of this distinction, the doctrine of transferred intent applies "to a completed murder" but not to an attempted murder. (*Id.* at pp. 190–191; *People v. Bland* (2002) 28 Cal.4th 313, 317, 326, 331.)

35

For an attempted murder conviction, "[w]hether the defendant acted with specific intent to kill 'must be judged separately as to each alleged victim.'" (*People v. Smith* (2005) 37 Cal.4th 733, 740.) "To be guilty of attempted murder of the [victim], defendant had to harbor express malice toward that victim. [Citation.] Express malice requires a showing that the assailant ""either desire[s] the result [i.e., death] or know[s], to a substantial certainty, that the result will occur.' [Citation.]"" (*Id.* at p. 739.) "[I]ntent to kill or express malice, the mental state required to convict a defendant of attempted murder, may in many cases be inferred from the defendant's acts and the circumstances of the crime." (*Id.* at p. 741.) Thus, "the act of purposefully firing a lethal weapon at another human being at close range, without legal excuse, generally gives rise to an inference that the shooter acted with express malice." (*Id.* at p. 742.)

*C. Analysis*

We agree with Olaez the prosecutor's closing argument on the attempted murder charge seemed to suggest the jury could use the transferred intent doctrine to find Olaez intended to kill R.M. The prosecutor's argument had the potential to lead the jury to erroneously believe it could infer Olaez's intent to kill J.R. was sufficient to find Olaez intended to kill R.M. However, the jury was specifically instructed transferred intent did not apply to attempted murder. "'[W]e generally presume that jurors are capable of following, and do follow, the trial court's instructions.'" (*People v. Jasso* (2025) 17 Cal.5th 646, 683–684.) We have no reason to presume otherwise here.

In analyzing whether the evidence was sufficient to support Olaez's conviction for the attempted premeditated murder of R.M., we find

36

instructive the California Supreme Court's decision in *People v. Stone* (2009) 46 Cal.4th 131 (*Stone*).

In *Stone*, the defendant was charged in a single count with the attempted premeditated murder of a specifically named victim based on the defendant firing a single shot at a group of 10 people. (*Stone, supra,* 46 Cal.4th at pp. 135–136.) The California Supreme Court held a defendant "who shoots into a group of people, intending to kill one of the group, but not knowing or caring which one, [can] be convicted of attempted murder." (*Id.* at p. 134.) It distinguished situations where there is a primary target (*People v. Bland, supra,* 28 Cal.4th 313) with the situation before it, where there was no primary target at all. (*Stone,* at p. 140.) The Supreme Court concluded: "[A] person who intends to kill can be guilty of attempted murder even if the person has no specific target in mind. An indiscriminate would-be killer is just as culpable as one who targets a specific person." (*Ibid.*) "Although a primary target often exists and can be identified, one is not required." (*Ibid.*) But regardless of "whether the alleged victim was particularly targeted or randomly chosen," a defendant's "'guilt of attempted murder must be judged separately as to each alleged victim.'" (*Id.* at p. 141; *People v. Canizales, supra,* 7 Cal.5th at p. 602.)

Here, a rational jury could have examined the evidence and concluded Olaez intended to kill one or more people in the group at the aqueduct when he fired four shots from the rifle. Olaez's actions of firing the rifle at the group was substantial evidence from which the jury could find a specific intent to kill R.M., who was in the group, and the jury could find at least one direct but ineffectual step towards the killing. (See *People v. Foster* (2021) 61 Cal.App.5th 430, 445 [upholding defendant's five attempted murder convictions based on actions of firing "a semiautomatic weapon seven times in

37

the direction of at least six individuals in rival gang territory"].) Thus, we affirm Olaez's attempted murder conviction.

## V.

### CUMULATIVE ERROR

Olaez contends "[t]he combination of evidentiary and instructional errors as well as the prosecutorial misconduct worked together to deny [him] of his rights to due process and a fair trial." We disagree.

"'Under the cumulative error doctrine, the reviewing court must "review each allegation and assess the cumulative effect of any errors to see if it is reasonably probable the jury would have reached a result more favorable to defendant in their absence."' [Citation.] 'The "litmus test" for cumulative error "is whether defendant received due process and a fair trial."'" (*People v. Mireles* (2018) 21 Cal.App.5th 237, 249.)

Although we have vacated the special circumstance and gang related firearm enhancements based on the Supreme Court's decision in *Clark*, 15 Cal.5th 743, that does not, when considered with Olaez's other claims, warrant reversal of his other charges and enhancements.

## VI.

### RESTITUTION FINE AND OTHER FEES

We are remanding for further proceedings that will result in a resentencing hearing whether or not the prosecution decides to retry the enhancements or special circumstance. We therefore do not address Olaez's contention the trial court abused its discretion by imposing a $10,000 victim restitution fine (§ 1202.4) and other fees (§ 1465.8, Gov. Code, § 70373) at his sentencing hearing.

## DISPOSITION

The gang-murder special circumstance on count 1 and the gang-related firearm enhancements on counts 1 and 2 are vacated. Olaez's sentence is also vacated.

On remand, the prosecution may elect to retry Olaez on the gang-murder special circumstance and/or the gang-related firearm enhancements. Whether the prosecution elects to retry these allegations, the trial court shall conduct a full resentencing hearing. In all other respects, the judgment is affirmed.


                                        MOTOIKE, ACTING P. J.

WE CONCUR:


GOODING, J.


SCOTT, J.

39